# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          WESTERN DIVISION

4          -oOo-

5    HONORABLE STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE

6

7    LARRY JONES, an individual;

8                    Plaintiff,

9         v.                          No. 2:24-cv-01388-SVW

10   COUNTY OF LOS ANGELES;
     LOS ANGELES COUNTY SHERIFF'S
11   DEPARTMENT; IRA YNIGO,

12                   Defendants.

13

14

15      REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

16                 LOS ANGELES, CALIFORNIA

17                  SEPTEMBER 18, 2024

18   _____

19

20                SUZANNE M. McKENNON, CRR, RMR
21                UNITED STATES COURT REPORTER

22                UNITED STATES COURTHOUSE
                  350 W 1st STREET, ROOM 3411
23                LOS ANGELES, CALIFORNIA 90012
                      (213) 894-3913
24                suzanne@ears2hands.com

25

```
1    APPEARANCES:

2

3    On Behalf of the Plaintiff:

4         APEMWOYAH KISOB ALARIC-LORENZO, Attorney at Law
               Kisob Law Firm
5              3680 Wilshire Boulevard, Suite P 04-1147
               Los Angeles, California 90010
6

7

8    On Behalf of the Defendants:

9         LENORE CABREROS KELLY, Attorney at Law
               Collinson Daehnke Inlow and Greco
10             21515 Hawthorne Boulevard, Suite 800
               Torrance, California 90503
11
          KAREN STEPANYAN, Attorney at Law
12             Pollak, Vida and Barer
               11500 West Olympic Boulevard, Suite 400
13             Los Angeles, California 90064

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX
2

3

4                            WITNESSES
5

6    FOR THE PLAINTIFF:

7                    Direct | Cross | Redirect | Recross | Further
8    LARRY JONES
        By Mr. Kisob        9
9       By Ms. Kelly                33

10

11   IRA YNIGO
        By Mr. Kisob              75, 93                  118
12      By Ms. Kelly        103

13

14   KENNETH GAY
        By Mr. Kisob    93 (terminated due to no live video)
15
        By Mr. Kisob    129                 135
16      By Ms. Kelly             133

17

18

19

20

21

22

23

24

25
```



**INDEX**


**EXHIBITS**


                                    **RECEIVED**                **MARKED**

Exhibit 1                              82
Exhibit 7                              30
Exhibit 8                              16
Exhibit 10                             84
Exhibit 13                             30
Exhibit 14-001 to 14-004               29
Exhibit 16                             84

1      (Proceedings commenced on September 18, 2024, at 10:31 a.m.)

2              THE COURT:  Call the first witness.

3              MR. KISOB:  Your Honor, the plaintiff calls Larry

4    Jones.

5              THE COURT:  Approach the sidebar, lawyers, for a

6    moment as soon as you --

7              (Sidebar commenced.)

8              THE COURT:  I forgot to mention one question, you

9    probably are aware of it, and that is no mention should be made

10   of a prior trial directly or indirectly and if it becomes -- do

11   you have a transcript of the prior trial?

12             MR. KISOB:  No.

13             THE COURT:  So to be clear, I'm ordering you, no

14   mention of the prior trial in any way.

15             MR. KISOB:  For impeachment?

16             THE COURT:  I mean, if there is no transcript how are

17   you going to impeach him?  I mean, in other words, are you

18   going to say a prior proceeding that you say X instead of this?

19   I mean, what's the -- the evidence that would bolster that

20   without a transcript?

21             MR. KISOB:  It was in this Court.

22             THE COURT:  What?

23             MR. KISOB:  The first trial was in this Court.

24             THE COURT:  What am I supposed to do?  Tell the jury

25   it was true or not?

1        MR. KISOB:  Number I just want to be able to question

2    him, well, didn't you see this?

3        MS. KELLY:  I'll object.

4        THE COURT:  Unless there is some way as to make it

5    clear that he isn't telling the truth, all it does is leaves

6    the issue dangling and causes the jury to speculate.  I'm not

7    going to allow that.

8        MS. KELLY:  Your Honor, there is a couple more

9    issues.  Karen Stepanyan on behalf of the defendant, so we have

10    already filed a Motion in Limine yesterday --

11        THE COURT:  I'm sorry.

12        MS. KELLY:  Plaintiff has filed a Motion in Limine

13    last night to preclude mention of prior conviction of

14    Mr. Jones, so we want to raise that issue.

15        THE COURT:  You can convict him with a prior felony.

16        MR. STEPANYAN:  Correct.  Impeach him; right, for

17    credibility.

18        MR. KISOB:  If it's been ten years since the

19    conviction or ten years since --

20        THE COURT:   Is it a felony conviction that is more

21    than ten years old?

22        MS. KELLY:  The subject of the Motion in Limine

23    pertained to his juvenile incarceration, but I never mentioned

24    that it was in the context of him receiving his high school

25    degree and the CYA in connection with his lost earnings claim.

1    That's the only time it came up.

2            MR. KISOB:  She said he had been in jail all his

3    life.

4            MS. KELLY:  He has.

5            MR. KISOB:  So if she's going to reference --

6            THE COURT:  Well, here's the thing.  If you're going

7    to ask the jury for lost earnings, then it would appear that

8    without specifically mentioning crimes that the defense has a

9    right to say he's been in jail most of his life and likelihood

10   of him making a livelihood in that regard is slim.

11           MS. KELLY:  I've been --

12           THE COURT:  One moment.  Why isn't that relevant?

13           MR. KISOB:  We're not going to ask for future --

14           THE COURT:  Okay.  You're going to ask for future

15   loss -- if you're talking about lost earnings, he was saying

16   that a question about hasn't he been incarcerated for most of

17   his life, I think that is the case and that is relevant because

18   it would appear that first of all, he has no employment history

19   and secondly, that would affect the jury's view of what his

20   potential was for earnings.

21           MR. KISOB:  Okay, Your Honor.  One last thing --

22           MS. KELLY:  Can I?

23           MR. KISOB:  We believe that the statements he made in

24   the prior trial are statements of a party of -- because he's a

25   defendant --

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

| | |
|---|---|
| 1 | THE COURT:  What did he say?  Whose statement? |
| 2 | MR. KISOB:  Ira Ynigo.  His testimony -- |
| 3 | THE COURT:  What did he say at the prior trial? |
| 4 | MR. KISOB:  What if I need to use to impeach? |
| 5 | THE COURT:  Well, you should have had a transcript. |
| 6 | MS. KELLY:  And you could have taken his deposition. |
| 7 | THE COURT:  Don't -- one moment. |
| 8 | MR. KISOB:  Even without the transcript, if my client |
| 9 | testifies about what he heard during the trial, Ynigo |
| 10 | statements made by a party opponent, there is case law. |
| 11 | THE COURT:  There is case law.  You show me the case |
| 12 | law. |
| 13 | MR. KISOB:  I'll get it. |
| 14 | THE COURT:  I'll reserve it for a moment until you |
| 15 | show me the case law. |
| 16 | MR. STEPANYAN:  Your Honor, there is one more issue. |
| 17 | Plaintiff intends to introduce a clip of a video showing the |
| 18 | severed tuft of his finger falling off the doorframe.  We think |
| 19 | it's too prejudicial to show it to the jury.  We're not arguing |
| 20 | that he hasn't injured his finger.  We're not arguing -- |
| 21 | THE COURT:  I think he can do that.  He can do that |
| 22 | as part the question of how painful it was. |
| 23 | MR. STEPANYAN:  To address that there is no |
| 24 | indication that plaintiff is in pain on that video.  He's not |
| 25 | showing any -- |

```
1              THE COURT:  You can argue that.
2         (Sidebar concluded.)
3              THE COURT:  All right.  Let's start.
4                     DIRECT EXAMINATION
5    BY MR. KISOB:
6    Q.   Mr. Jones --
7         Your Honor, sorry.  I don't know that he's been sworn in?
8              THE COURTROOM DEPUTY:  Not yet.
9         (A discussion was held off the record.)
10             THE COURTROOM DEPUTY:  Mr. Jones, do you solemnly
11   swear that the testimony you are about to give in are the cause
12   now before this Court be the truth, the whole truth, and
13   nothing but the truth?
14             THE DEFENDANT:  Yes.
15             THE COURTROOM DEPUTY:  Thank you.
16                    DIRECT EXAMINATION
17   BY MR. KISOB:
18   Q.   Mr. Jones, good morning.
19   A.   Good morning.
20   Q.   Have you please very briefly tell the jury how the
21   underlying incident giving rise to this lawsuit happened?
22             THE COURT:  That's too broad a question.  It calls
23   for a narrative.  The format in a trial is to ask a question
24   and an answer in little pieces so that it can be heard by the
25   jury in some sequential way, not to ask that that kind of
```

1    question, so start again.

2    BY MR. KISOB:

3    Q.   Mr. Jones, on September 19, 2023, what exactly happened

4    between you and Deputy Ynigo that resulted in the filing of

5    this lawsuit, briefly?

6            MS. KELLY:  Objection.  Vague and ambiguous.

7            THE COURT:  It's sustained.  It's not vague.  It's

8    the same issue again calling for a narrative.  You have to ask

9    questions that allow the jury at the conclusion of the

10   questions and the answers, get the composite.  That's the

11   nature of the trial.

12           MR. KISOB:  Forgive me, Your Honor.

13           THE COURT:  Do what I said.  Do what I said.

14           MR. KISOB:  Your Honor, I don't want to ask leading

15   questions.  It's on direct.

16           THE COURT:  I'm not going to argue with you in front

17   of the jury but you're an experienced lawyer and the format I'm

18   suggesting is not novel.  And if the witness can't respond to

19   your questions, and there are proper objections, I'll sustain

20   them.  If they're improper, I'll overrule them.  Proceed in the

21   normal way.

22   BY MR. KISOB:

23   Q.   Mr. Jones, on what time September 19, 2023, did you take a

24   shower?

25   A.   I want to be able to give a precise time but it was

1    morning showers.

2    Q.    How long were you in the shower for?

3    A.    I was in the shower for a while.  I had a man down in the

4    shower because I have a plastic chair that there is no rails,

5    adequate rails for ADA. People that's in the shower.

6            THE COURT:  Objection, sustained.  The question has

7    to be instructed to answer the question.  The question was:

8    How long was he in the shower.  That calls for an answer that

9    relates to time.  If you want to ask him what circumstances he

10   faced in the shower or why he was in the shower, ask him that

11   question.  That's the format.

12   BY MR. KISOB:

13   Q.    What circumstances did you face in the shower, Mr. Jones?

14   A.    I fell.  I have a man down.  They have a plastic chair.

15   Q.    And what happened after you had a man down?

16   A.    All the inmates starting banging for custody to come help

17   me in the shower.

18            MS. KELLY:  Objection.  Hearsay.

19            THE COURT:  Overruled.

20   BY MR. KISOB:

21   Q.    And what happened after the banging?

22   A.    Nobody came until like 45 minutes later.

23   Q.    And then at that point, what happened?

24   A.    It was Deputy Ynigo and Sergeant Aramela came.

25   Q.    What did they do when they came?

1    A.    I told them that I had man down so they refused to take me

2    to man down and placed me back in my cell.

3    Q.    Who placed you back in your cell?

4    A.    Deputy Ynigo.

5    Q.    How did you get back to your cell?

6    A.    I used my cane.

7    Q.    Were there any discussions between you and Deputy Ynigo

8    when you went back into your cell?

9    A.    Yes.

10   Q.    What were those?

11   A.    He slammed my chase light because I told him that I was

12   going to call my light for a man down because he didn't take me

13   for a man down.

14            MS. KELLY:  Objection.  Hearsay.

15            THE COURT:  Overruled.  Stand up when you make an

16   objection.

17   BY MR. KISOB:

18   Q.    What happened after he closed your tray slot?

19   A.    Um.  I asked him why you closing my tray slot.

20   Q.    What did he say?

21   A.    Because you're acting like a --

22   Q.    What happened after that?

23   A.    He closed my door and my laundry bag was in the shower, so

24   he went and gave me my laundry bag and opened my door again.

25   Q.    From your cell, is it possible for you to see what is

```
 1   happening outside?
 2   A.    Yes.
 3   Q.    So is that how you were able to see what was happening?
 4   A.    Correct.
 5   Q.    So when he gave you back your -- what happened after he
 6   gave you back your bag?
 7   A.    He gave me back my laundry bag.  So I have a cane so I
 8   used my right hand on the door for my mobility.
 9   Q.    And what happened after that?
10   A.    I asked him if I could speak to the Sergeant.
11   Q.    What did he say?
12   A.    He slammed the door on my finger and trapped my finger in
13   the door.
14   Q.    Where were you standing when he slammed the door?
15   A.    At the door.
16   Q.    In your opinion, could he see that you were standing at
17   the door?
18   A.    Right in front of him.
19              MS. KELLY:  Speculation.
20              THE COURT:  Overruled.
21   BY MR. KISOB:
22   Q.    Please answer.
23   A.    I was standing right in front of him.
24   Q.    What happened after he slammed the door?
25   A.    He looked at me screaming and he turned around and try to
```

1    put Gay back into his cell, inmate Gay.

2    Q.    Why were you screaming?

3    A.    Because my finger was trapped in the door.

4    Q.    On a scale of one to ten, how would you rate the pain that

5    you were feeling?

6    A.    A hundred.

7    Q.    And then what happened after -- after you saw him talking

8    to Gay?

9    A.    Gay refused to go back to his cell because he said, I'm

10   already in the shower.

11   Q.    And then what happened after that?

12   A.    He told Gay, well, I've got to put you back because all

13   these -- all this mother fucker acting up.

14   Q.    Was that it?  Was that the end?

15   A.    Yes.  He walks off while I'm screaming still with my

16   finger trapped in the door.  So I did complain.  People were

17   saying that on my door there's a finger.  I had to rip my own

18   finger out of the door to get out.

19   Q.    About how long was your finger stuck in the door?

20   A.    It seemed like forever because I was screaming.

21   Q.    And what happened after he walked away?  I'm sorry.

22         When was the next time that someone came to see you at

23   your cell?

24   A.    The next person that came was Deputy Cruz.

25   Q.    How do you know it's Deputy Cruz?

1  A.   He's regular floor staff that works with Ynigo.

2  Q.   What did he do when he came?

3  A.   He came with a Sergeant and another Deputy with a video

4  camera.

5  Q.   And what happened when he came with video camera and

6  everything?

7  A.   They opened my tray shot and I stuck my finger out and the

8  whole tip was gone and the nurse says he has to go out.

9  Q.   Okay.  At this time I would like to show to you what has

10 been identified as Exhibit Number 6.  Exhibit Number 6.

11       Just a moment, Your Honor.  I'm trying to connect to the

12 air play.  Video camera, Cruz, Gay, Deputy Cruz, Ynigo

13 accounts.

14            MR. KISOB:  Sorry, Your Honor, I'm just trying to

15 connect to the court's system.  Should take me a minute.

16            THE COURT:  I'm seeing a picture of a street.  Is

17 that what you want to show?

18            MR. KISOB:  Yes, but I need to connect my laptop to

19 it.  I did it this morning and it worked and now it's giving me

20 some issues.  But I should be able to resolve it in a minute or

21 two.

22 Q.   While I'm setting up, Mr. Jones, were you at any time on

23 September 19 put in handcuffs?

24 A.   No.

25 Q.   Can you please turn to Exhibit Number 9 [sic]?  Do you

```
1   have it in front of you?
2   A.    Yes.
3   Q.    Have you ever seen the document before?
4   A.    Yes.  That sign is also on the door upon entering.
5   Q.    Where?
6   A.    To our hall row.
7   Q.    To hall row where?
8   A.    To the tier that we were housed in, that's on the door.
9   Q.    That's at the jail where you are?
10  A.    Correct.  It's on our floor door so all officers know to
11  handcuff us.
12  Q.    What does it say?
13  A.    All inmates shall be handcuffed to the rear whenever
14  exiting their housing locations.  No exceptions.
15          MR. KISOB:  Your Honor, plaintiff moves to add mite
16  Exhibit Number 8.
17          THE COURT:  Received.
18      (Exhibit 8 was received into evidence.)
19  BY MR. KISOB:
20  Q.    Please turn back to Exhibit Number 6.  I'm going to play
21  the video.
22          THE COURT:  We can't waste more time.  We spent five
23  or ten minutes with your effort to get the video going.
24          MR. KISOB:  It's working now.
25          THE COURT:  Okay.  Let's go.
```

```
1   BY MR. KISOB:
2   Q.    Do you recognize the person with the white towel on his
3   head?
4   A.    Yes.
5   Q.    Who is that?
6   A.    Me.
7   Q.    And who is the person who just closed the cell door?
8   A.    Ynigo.
9   Q.    Is this the Deputy sitting right here today?
10  A.    Yes.
11  Q.    And who is this gentleman walking towards the camera?
12  A.    Sergeant Aramela.
13  Q.    Okay.  And do you happen to know the person he's talking
14  to?
15  A.    Inmate Lafonzo Turner.
16  Q.    And who's cell door is that that was just opened?  Do you
17  know?
18  A.    Kenneth Gay.
19  Q.    Can you say that again?
20  A.    Inmate Kenneth Gay.
21  Q.    There was a door with a red kind of sign on it.  Do you
22  know what that door is, where it leads to?
23  A.    That leads to the -- where you turn on the water and the
24  toilet -- the supplies room.
25  Q.    And who is this gentleman who is facing the warden looking
```

1    at the TV?

2    A.    Deputy Ynigo.

3    Q.    Is it the Deputy sitting right here today?

4    A.    Yes.

5    Q.    Whose cell door is that again, the one that is open?

6    A.    Kenneth Gay.

7    Q.    Who is gentleman who's walking away?

8    A.    Which one?  Above?

9    Q.    No, going towards the door with the white?

10   A.    Deputy Ynigo.

11   Q.    Do know the gentleman who is just walking out of this door

12   right now?

13   A.    Kenneth Gay.

14   Q.    Who is the gentleman who just closed that door that you

15   just saw?

16   A.    Kenneth Gay.

17   Q.    Can you see the time stamp at the bottom of the video

18   screen?  Can you see from there?

19   A.    No, I can't.  It's too far.  Oh, yeah.  September 19,

20   2023.

21   Q.    And the exact time, can you see it?  Where it says 7:13

22   and then you have the seconds counting?

23   A.    Yes.

24   Q.    So hold on, let me back up a little bit.

25         Which door is that?  The door that is open?

```
1    A.    My door.
2    Q.    No, the door that is open?
3    A.    Oh, the shower.
4    Q.    And who is the person trying -- the person holding the
5    bag?
6    A.    Deputy Ynigo.
7    Q.    Was that when he kicked the door shut on your finger?
8    A.    Correct.
9    Q.    Do you know what was happening at this time?
10   A.    Yes.  He asked Kenneth Gay, I've got to put you back in
11   the cell and Kenneth Gay said, I'm already in the shower and he
12   said, well, because I've got to deal with this mother fucker is
13   acting up.
14   Q.    Okay.  And right behind the deputy, what do you see
15   standing right there?
16   A.    The telephone.
17   Q.    Was that the phone you were asking to use?
18   A.    Yes.
19   Q.    Are there times when you've been able to use this phone
20   even though inmates were -- other inmates were trying to go
21   into the shower?
22   A.    Every day.
23   Q.    Who is this gentleman walking away?
24   A.    Deputy Ynigo.
25   Q.    Was that the same person who kicked the door shut on your
```

1    finger?

2    A.    Correct.

3    Q.    At this point in the screen, there is someone who appears.

4    Do you see a person who's looking through the cell door?

5    A.    The inmate Lafonzo Turner.

6    Q.    How do you call that area where he's face seems to be

7    poking out of?

8    A.    The tray port.

9    Q.    Was your tray slot open on that day?

10   A.    Nope.

11   Q.    Why was it not open?

12   A.    Because Deputy Ynigo slammed it.

13   Q.    Can you see the cursor I'm moving around?

14   A.    Yes.

15   Q.    Is that your cell door?

16   A.    Yes.

17   Q.    Is that -- do you recognize this area?  What would be in

18   this part of the door?

19   A.    The tray port.

20   Q.    At this time was it opened or closed?

21   A.    Closed.

22   Q.    Do you see the time stamp at the bottom of the screen?

23   A.    It's 7-2, I mean, 7:13.

24   Q.    Okay. 7:13.  Correct.  Do you see the time stamp now?

25   A.    7:18.

1  Q.  You said 7:18; correct?

2  A.  7:18:32.

3  Q.  Okay.  And by this time, had anyone come to see you?

4  A.  No.

5  Q.  Do you recognize this gentleman who just walked by the

6  camera, the first person?

7  A.  Yes, that's Deputy Cruz.

8  Q.  How do you know it's Deputy Cruz?

9  A.  He's a regular force.

10  Q.  What is the time stamp now?  Do you see it?

11  A.  7:20.

12  Q.  By this time, had anyone opened your cell to remove you

13  from the cell?

14  A.  No.

15  Q.  Do you know this person with the roller who seems to be

16  walking away?

17  A.  That was RN Sanchez.

18  Q.  What do you mean by RN?

19  A.  Our registered nurse.

20       MR. KISOB:  Your Honor, at this time plaintiff would

21  love to introduce into evidence Exhibit Number 6 and limit it

22  to just this portion that has been shown to the jury.

23       THE COURT:  And how is it designated?  Is it edited

24  for the jury, just this portion?

25       MR. KISOB:  Yes.  We removed --

```
 1              THE COURT:  Already it's admitted.
 2              MR. KISOB:  I've shown this to defense.
 3              THE COURT:  It's admitted.
 4   BY MR. KISOB:
 5   Q.   Mr. Jones, please turn your attention kindly please to
 6   Exhibit Number 3.  Do you recognize these people?
 7   A.   Yes, that's Deputy Cruz and Registered Nurse Sanchez.
 8   Q.   When was this?
 9   A.   After my finger was slammed in the door.
10              (Video playing.)
11   BY MR. KISOB:
12   Q.   Do you see where like circling the console?
13   A.   Yes.
14   Q.   Do recognize what you see?
15   A.   Yes, the fingertip.
16        (Video playing.)
17   Q.   Can you see the time stamp?
18   A.   7:22:00.
19        (Video playing.)
20   BY MR. KISOB:
21   Q.   Right here where I'm circling, do you recognize that what
22   appears to be an object right here in the video, right here?
23   A.   My cane.
24   Q.   Let me just ask you, why do you use a cane?
25   A.   For my mobility, when I stand up my knee is all messed up
```

```
 1   from my motorcycle accident.
 2   Q.   When did you have this accident?
 3            MS. KELLY:  Objection.  Relevance.
 4            THE COURT:  Sustained.
 5   BY MR. KISOB:
 6   Q.   At this point where was the tip of your finger?
 7   A.   On the floor.
 8   Q.   Do you see the area I'm circling around?
 9   A.   Yes.
10   Q.   What is that?
11   A.   My wheelchair.
12   Q.   And do you use a wheelchair for the same reason that you
13   use a cane?
14   A.   Correct.
15        (Video playing.)
16   BY MR. KISOB:
17   Q.   Do you recognize this area in the video?
18   A.   It's the nurse station.
19   Q.   How did you get there?
20   A.   They rolled me all the way over there.
21   Q.   What is the time stamp on the screen?
22   A.   7:24:22.
23   Q.   At this time how do you rate the pain you were feeling?
24   A.   Unbearable pain.  It was feeling unbearable pain and
25   people were snickering, like laughing on the side.
```

```
 1          (Video playing.)
 2   BY MR. KISOB:
 3   Q.    At this point, did you know where the tip of your finger
 4   was?
 5   A.    No, I did not.
 6   Q.    Can you tell us what was happening at this point?
 7   A.    They was just dipping my finger in some cellophane, I
 8   mean, saline, saline.
 9          (Video playing.)
10   BY MR. KISOB:
11   Q.    Can you see what the time stamp is right now?
12   A.    7:34:25.
13   Q.    Can you please tell us what was happening at this time?
14   A.    They was just still doing vitals on me right now.
15          (Video playing.)
16   BY MR. KISOB:
17   Q.    Do you know where they were taking you at this point?
18   A.    Yeah.  That was the paramedic getting ready to take me to
19   the outside hospital.
20          (Video playing.)
21   BY MR. KISOB:
22   Q.    If you could please turn to Exhibit Number 12.  Do you
23   have it open in front of you?
24   A.    Yes.
25   Q.    Have you seen this document before?
```

```
1   A.   Yes.

2   Q.   What is it?

3   A.   It's a inmate grievance.

4   Q.   What is an inmate grievance to your understanding?

5   A.   When there is any type of a situation, complaint, medical

6   violation of your rights or staff misconduct.

7   Q.   So what was this particular inmate grievance?

8   A.   This particular inmate grievance was on Ynigo kicking the

9   door and taking my finger off.

10  Q.   What do you know --

11            THE COURT:  Is this the grievance that follows the

12  incident?

13            MR. KISOB:  Yes, Your Honor.

14            THE COURT:  And this is his description of what

15  happened?

16            MR. KISOB:  Yes, Your Honor.  This is the result.

17            THE COURT:  Did you have objection?

18            MS. KELLY:  Yes, Your Honor.  Objection.

19            THE COURT:  What ground?

20            MS. KELLY:  This is the not the document that is --

21  foundation is being laid for.  This is a -- Exhibit 12 states

22  Result of Inmate Grievance against staff review.  This is not

23  --

24            THE COURT:  But it's his version of what happened.

25  He's telling the jury now what his version of what happened is
```

| | |
|---|---|
| 1 | and you'll walk him through it.  It seems to me this is not |
| 2 | relevant. |
| 3 | MR. KISOB:  No, it is relevant -- |
| 4 | THE COURT:  Don't tell me -- I am saying it is not |
| 5 | relevant, so it's not relevant at this point. |
| 6 | MR. KISOB:  The result -- |
| 7 | THE COURT:  Ignore it.  Move on.  Don't argue with |
| 8 | me. |
| 9 | MR. KISOB:  Forgive me, Your Honor. |
| 10 | THE COURT:  When I tell you, I rule it, it's not |
| 11 | relevant.  It's not relevant at this point.  If there's |
| 12 | something that persuades me that it is relevant, I'll change my |
| 13 | mind.  At this point, it isn't relevant.  Ask the next |
| 14 | question. |
| 15 | MR. KISOB:  Your Honor, can I ask him as to the |
| 16 | result? |
| 17 | THE COURT:  Don't ask me.  Just ask him a question. |
| 18 | BY MR. KISOB: |
| 19 | Q.   Mr. Jones, what was the result of the grievance that you |
| 20 | filed? |
| 21 | A.   It was granted. |
| 22 | MS. KELLY:  Objection.  Calls for speculation. |
| 23 | THE COURT:  Granted, meaning what?  I don't |
| 24 | understand this.  In other words, this grievance it was |
| 25 | accepted? |

```
1              MR. KISOB:  Yes, Your Honor.
2              THE WITNESS:  He was disciplined for --
3              MR. KISOB:  No, No.
4              MS. KELLY:  Objection.  Calls for speculation.  Lacks
5    foundation.
6              THE COURT:  Leave this alone for the moment because
7    I'm not following this clearly to make a ruling.  He'll be
8    cross-examined so we'll have time for to ask this if necessary?
9              MR. KISOB:  Okay, Your Honor.
10   Q.   Mr. Jones?
11   A.   Yes.
12   Q.   Please turn to Exhibit Number 13.
13             THE COURT:  Isn't this the similar thing to what you
14   said before, what you did before?  Take it off the screen.
15             MR. KISOB:  It's the grievance that was filed, Your
16   Honor.
17             THE COURT:  It's similar to what the issue was
18   before?
19             MR. KISOB:  Yes, Your Honor.
20             THE COURT:  Leave it alone for the moment.
21   BY MR. KISOB:
22   Q.   Please turn to Exhibit Number 15, Mr. Jones.
23             MS. KELLY:  Excuse me, Mr. Kisob, we have the wrong
24   list.
25             MR. KISOB:  Your Honor, just noting that defendants
```

1    have given me their own version of the exhibit list.  I was

2    using my version but I'll go with theirs.

3    Q.    Mr. Jones, please turn to what is now Plaintiff's

4    Exhibit 14.  Do you recognize -- what do you see in the

5    document?

6    A.    My fingertip missing.

7    Q.    Who took this photograph?

8    A.    My wife.

9    Q.    Exhibit Number 14-002, please turn to that next page.

10         Do you recognize this picture?

11   A.    Yes.

12   Q.    Whose hand is that?

13   A.    Mine.

14   Q.    Who took the photograph?

15   A.    My wife.

16   Q.    Please the next page, Exhibit 14-003, do you recognize

17   this picture?

18   A.    Yes.

19   Q.    Whose hand is that?

20   A.    Mine.

21   Q.    Who took the picture?

22   A.    My wife.

23   Q.    Same thing, next page 14-004, do you recognize this

24   picture?

25   A.    Yes.

1  Q.   Who took the picture?

2  A.   My wife.

3  Q.   Whose hand is that?

4  A.   Mine.

5          MS. KELLY:  Objection, Your Honor, cumulative.

6          THE COURT:  It is cumulative at this point.

7          MR. KISOB:  Your Honor, plaintiff would move to admit

8  into evidence 14-001 to 14-004.

9          THE COURT:  Received.

10      (Exhibit 14-001 to 14-004 was received into evidence.)

11  BY MR. KISOB:

12  Q.   Mr. Jones, can you please turn to Exhibit Number 18.

13  Sorry, just a moment.  Number Please turn to what you have as

14  Exhibit Number 17.

15      Your Honor, it's the same thing.  It's a grievance.  I

16  don't know if I should leave it for later.

17          THE COURT:  Leave it be, don't keep going back to

18  something that I told you I would address later.  Move on.

19  BY MR. KISOB:

20  Q.   Mr. Jones, can you please turn to Exhibit Number 7?

21          MR. KISOB:  Your Honor, these are medical records

22  that have been authenticated by the custodians of record.  I

23  don't know if we should just stipulate --

24          THE COURT:  Are these agreed to or what?

25          MS. KELLY:  Yes, Your Honor, these are agreed to

```
 1   exhibits.
 2           THE COURT:  All right.  They are in evidence, Exhibit
 3   17 in evidence,
 4           MR. KISOB:  Seven, Your Honor.
 5           MS. KELLY:  Seven.
 6           THE COURT:  Seven is in evidence.
 7           MR. KISOB:  And, Your Honor, it will be the same for
 8   Exhibit Number 13.
 9           THE COURT:  All right.  That's in evidence, too.
10       (Exhibit 7 and 13 was received into evidence.)
11   BY MR. KISOB:
12   Q.   Mr. Jones, I want to talk now about the -- your emotional
13   state of mind.  Can you please tell us how this incident has
14   affected you emotionally?
15   A.   Every time I, like, I brush into something, I hit my
16   finger, I'm reminded of that day because I have shooting pain
17   constantly in my hand and every time I hit my hand or grab
18   something, I'm always in constant pain.
19   Q.   And do you continue to experience pain in that particular
20   finger?
21   A.   Yes.  They put me on nerve damage medication, as well.
22   Q.   As you sit here today, does the finger look the same like
23   it did in the morning of September 19, 2023, before you took a
24   shower?
25   A.   No.
```

```
1    Q.   What has changed?
2    A.   Deformity and my nail grew messed up.  They said I will
3    never grow a regular nail ever again.
4    Q.   Can you please show the jury what that finger looks like
5    now?
6              MR. KISOB:  Your Honor, may I bring the witness to
7    the front of the jury?
8              THE COURT:  Can you all see his finger?  They can see
9    his finger.
10   BY MR. KISOB:
11   Q.   Mr. Jones, before we wrap up, I just want to get a little
12   bit of background information about, you know, your life and
13   everything.  Are you married?
14   A.   Yes.
15   Q.   Where is your wife?
16   A.   In the audience right there.
17   Q.   Do have children?
18   A.   Yes.
19   Q.   How many?
20   A.   One.
21   Q.   And how long have you been at the Men's Center Jail?
22   A.   Since August of 8th of last year.
23   Q.   By last year, you mean 2023; correct?
24   A.   Correct.
25   Q.   And how long do you expect -- or do know how long you're
```

1    going to be inside the jail?

2    A.    I should be getting released any time but Men's Central

3    County Jail has found a way to not let me go to court.

4             MS. KELLY:  Objection.  Calls for speculation.

5             THE COURT:  He doesn't know when he's going to be

6    released.  That's speculative.  Unless he has a release date?

7    Ask him if he has a release date.

8    BY MR. KISOB:

9    Q.    Do you have a release date?

10   A.    Yes.  I'm down here for resentencing and I have a paid

11   attorney.

12   Q.    Do you have a release date?

13            MS. KELLY:  Nonresponsive.

14            THE DEFENDANT:  Number Because I'm on re-sentencing.

15            THE COURT:  He's not answering so ask another

16   question?

17   BY MR. KISOB:

18   Q.    Where are your parents?

19            MS. KELLY:  Relevance, Your Honor.

20            THE COURT:  Sustained.

21            MR. KISOB:  Just background.

22   BY MR. KISOB:

23   Q.    Do you intend to ever look for a job if you are to be

24   released from prison?

25            MS. KELLY:  Objection.  Leading.

```
 1              THE COURT:  Overruled.
 2   BY MR. KISOB:
 3   Q.   Let me take it back.
 4        What would you do upon your release from prison?
 5   A.   If I get out, I'm a high school graduate.  I graduated.  I
 6   even took paralegal classes while I was in prison and I plan to
 7   start a life with my wife and we've already got plans for me to
 8   go back to college because I started college until this case
 9   happened.
10              MR. KISOB:  Nothing further, Your Honor.
11              THE COURT:  Okay.  Cross-examination.  Stay a way
12   from the issue that we spoke about at sidebar.  Do you have
13   that in mind?
14              MS. KELLY:  Yes, Your Honor.
15              THE COURT:  Related to future earnings and so forth.
16   Go ahead.  He didn't ask about future earnings.  He did in a
17   way what he expected to do with the education and look for a
18   job, so you can ask questions relating to that but stay away
19   from the issue for the time being that we discussed at sidebar.
20              MS. KELLY:  Yes,  Your Honor.
21              THE COURT:  If you don't understand what I said, I'll
22   clarify it.
23        Do you understand what I said?
24              MS. KELLY:  Yes.
25              THE COURT:  All right.  Then move on.
```

```
 1
 2                           CROSS-EXAMINATION
 3   BY MS. KELLY:
 4   Q.   Good morning, Mr. Jones.
 5   A.   Good morning.
 6   Q.   So just to be clear, you are currently housed at Men's
 7   Central Jail in the 7,000 floor awaiting your re-sentencing
 8   hearing; is that right?
 9   A.   Correct.
10   Q.   And you are were delivered here in August of 2023 when you
11   arrived at Central Jail from Corcoran State Prison where you
12   were serving your time for the conviction for the offense that
13   you are now going back to court on; is that right?
14   A.   Correct.
15   Q.   Thank you.  And with respect to the treatment that we saw
16   that was rendered to you by the jail medical staff in the video
17   just now, you have never been billed or seen a bill for you to
18   pay for any of that; is that correct?
19             MR. KISOB:  Objection, Your Honor.  Relevance.
20             THE COURT:  You are not requesting medicals, are you?
21             MR. KISOB:  No, Your Honor.
22             THE COURT:  So it's irrelevant.  Sustained.
23   BY MS. KELLY:
24   Q.   Let's talk about the morning of the incident, so I'll take
25   your memory back there.  That was September 19, 2023.  Do you
```

1    have that mind?

2    A.    Yes.

3    Q.    And your recollection was that the shower programming or

4    scheduling was in the morning?

5    A.    Yes.

6    Q.    Had you essentially just gotten up?  Was it closer in the

7    earlier part of the morning?

8    A.    Yes.

9    Q.    Had you been talking on the phone prior to being told that

10   the shower was now available for your use?

11   A.    I asked for the shower, yes.

12   Q.    But my question was whether you were previously speaking

13   on the telephone before you were told that the shower was now

14   available to you; correct?

15   A.    Can you rephrase that?

16   Q.    Were you on the phone before you were told it's time to

17   take a shower?

18   A.    I asked to go to the shower.

19          MS. KELLY:     That's not my question, Your Honor.

20   I'd really like the witness to --

21          THE COURT:  Ask him again, if he doesn't answer, I'll

22   instruct him to answer.

23   BY MS. KELLY:

24   Q.    My question, Mr. Jones, was prior to you being told that

25   the shower was available, were you on the telephone?

1  A.   Was I on the phone before the shower, is that what you're
2  asking?
3  Q.   Yes.
4  A.   Yes.
5  Q.   Okay.  And we saw the telephone equipment in the video
6  which is that stand with wheels on it that looks like a large
7  coat rack; correct?
8  A.   Correct.
9  Q.   Okay.  And the telephone that is made available to the
10 inmates such as yourself, has a cord portion that feeds through
11 the tray slot in order for you to use the talking portion; is
12 that right?
13 A.   Correct.
14 Q.   And so when you use the telephone, you're seated inside
15 your cell, and the cord is fed through the tray slot and the
16 rest of the telephone is the stand; correct?
17 A.   Correct.
18 Q.   Okay.  And so your cell location on the 7000 row was right
19 across from the shower that you eventually went into; is that
20 right?
21 A.   Correct.
22 Q.   And that's about three or four steps away?
23 A.   Correct.
24 Q.   And that's the same shower that you had been using --
25 strike that.

1     You were in the same cell since you arrived at the 7000
2     floor that was right across from the shower since you were
3     assigned there; right?
4     A.   Correct.
5     Q.   Okay.  And it's three to four steps from your cell to the
6     shower?
7     A.   Correct.
8     Q.   Okay.  And the shower itself, is that a shower that fits
9     more than one person or is it a shower for one person?
10    A.   One person.
11    Q.   And the shower controls when you're inside, are they there
12    for you to turn the water on and off or are they outside of
13    that area?
14    A.   Outside the area.
15    Q.   Okay.  So when you are standing inside of your cell and
16    the door opens, the door opens from the left to the right as
17    you're looking out; correct?
18        I'm sorry.  From the -- yes, from the left to the right as
19    you're looking out into the hallway; is that right?
20    A.   Yes.
21    Q.   So from your perspective as you're standing at your cell
22    door, the hinges that open and close the door are on the right
23    side; correct?
24    A.   Correct.
25    Q.   All right.  And the shower that was steps away from your

```
1   cell door is that a different door or the same kind of door as

2   the door to your cell?

3   A.    A different door.

4   Q.    Okay.  So you were talking about the door to your cell as

5   being a solid door and there's a window on it; correct?

6   A.    Correct.

7   Q.    And the shower door that is across from you, is that like

8   a gated door or a barred door?

9   A.    It's a gated door.

10  Q.    Okay.  But you can see and hear through the gated door,

11  there's no plastic or anything; right?

12  A.    No.

13  Q.    Okay.  And as you are leaving your cell to go to the

14  shower, can you describe -- strike that.

15       Does the shower door open from the left to the right as

16  you're entering it or the other way?

17  A.    Yes.

18  Q.    It opens from the left to the right?

19  A.    Yes.

20  Q.    Okay.  So the shower door has the hinges on the right side

21  as well; right?

22  A.    Yeah, from the outside, yes.

23  Q.    Okay.  The bag that was returned to you that morning that

24  was your laundry bag?

25  A.    Correct.
```

1    Q.    Did you typically do some of your laundry items in the
2    shower when you were taking a shower?
3    A.    Correct.
4    Q.    Okay.  And you also would put your change of clothes in
5    there, your shorts or your T-shirts when you were done?
6    A.    Yeah, I placed them in my bag.
7    Q.    Okay.  So this is the bag that we're referring to that was
8    -- that you had left behind after you completed your shower
9    that day; correct?
10   A.    Correct.
11   Q.    Okay.  So when you were taking your shower you had stated
12   that you had fallen on a chair inside the shower that slipped;
13   correct?
14   A.    Correct.
15   Q.    Okay.  But you didn't sue for that; right?
16         MR. KISOB:  Objection, Your Honor.
17         THE COURT:  Sustained.
18   BY MS. KELLY:
19   Q.    After you slipped and you were then speaking to the Deputy
20   and the Sergeant that came to the shower, was that the time
21   that you were then taken from your shower back to your cell?
22   A.    Correct.
23   Q.    Okay.  And at that time did you intend to make your -- to
24   complete the phone call that you were on after completing your
25   shower had this incident not occurred?

```
 1    A.   Had it not occurred?

 2    Q.   Yeah.

 3    A.   When I got back on the phone?

 4    Q.   Right.  You were talking to your wife, weren't you?

 5    A.   Right.

 6    Q.   Okay.  So your plan was, I'm going to take a shower and

 7    I'll call her back?

 8    A.   I didn't finish my time so it was still my time.

 9    Q.   Sure.  So your intention was to finish your shower and

10    request the phone again so that you could complete your call

11    because you still had time left on your privilege for making a

12    call; correct?

13    A.   I don't have to request.  We just get the phone.

14    Q.   But you just stated that you didn't finish your call so

15    you wanted to finish it, is my point.

16    A.   Correct.

17    Q.   Okay.  And so it would have been the same procedure for

18    the cord to be through your tray slot so you can communicate on

19    the equipment to complete your call; right?

20    A.   Correct.

21    Q.   Okay.  And at this point your door is closed and then you

22    realize that your bag was still in the shower.  Are you with me

23    so far?

24    A.   I'm following you.

25    Q.   Okay.  And so when Deputy Ynigo opened the door to return
```

```
 1    your bag, did you have an awareness right before then that

 2    Mr. Kenneth Gay was also approaching the shower who was the

 3    next inmate behind you to take his turn to take a shower?

 4    A.   Correct.

 5    Q.   Okay.  And so when Deputy Ynigo handed the bag -- opened

 6    the door to you, did you say anything -- did he say anything to

 7    you or you say anything to him about the bag or anything else?

 8    A.   Did I say anything?

 9    Q.   Right?

10    A.   About the bag?

11    Q.   At all?

12    A.   I am not understanding your question.

13    Q.   Was there any words exchanged when he opened the door to

14    return your bag to you?

15    A.   I asked him, why is my tray slot closed.

16    Q.   Okay.  And at that point did he return the bag to you that

17    had left in the shower?

18    A.   He returned it at the same time and said, because you're

19    acting like an ass hole.

20    Q.   I am asking you when he returned the bag to you, that was

21    when you were trying to talk to him; correct?

22    A.   I talked -- yeah, at the same time, yes.

23    Q.   Thank you.  And so you were standing at the doorway and

24    not seated in your wheelchair; right?

25    A.   I had my cane in my hand, yes.
```

1  Q.    Okay.  You're left-handed, aren't you?

2  A.    And the cane was in my left.

3  Q.    You're left-handed, aren't you?

4  A.    Yes.

5  Q.    Okay.  And the injury to your hand was to your right hand;

6  correct?

7  A.    Correct.

8  Q.    All right.  And so when he handed the bag to you, what

9  hand did you take the bag from, if you did?

10  A.    What hand?

11  Q.    Yes?

12  A.    I grabbed it with my right.

13  Q.    Okay.  And then you put your right hand on the doorframe

14  which is where the video shows that the door closed on it?

15  A.    Yeah, because the wheelchair's at the door so I put the

16  bag in the wheelchair and I put my hand back on the door.

17  Q.    Mr. Jones, can you --

18         MS. KELLY:  Can I please have the witnesses answer

19  just the question?

20         THE COURT:  He's answering the questions.  He

21  answered.  He replied that he put his hand on the doorframe.

22  BY MS. KELLY:

23  Q.    After the door closed and you realized it was on your

24  finger, it was caught there, was it not?

25  A.    Number He slammed and kicked it on my finger.

```
1   Q.   My question, Mr. Jones, was once the door closed and you
2   realized your finger was in the door and it was closed, it was
3   caught there, was it not?
4   A.   It was kicked there, yes.
5             MS. KELLY:  Move to strike.
6             THE COURT:  She didn't ask you that, Mr. Jones.  Just
7   listen to the question and answer it.  And ask the question
8   again, maybe it will be answered now.
9   BY MS. KELLY:
10  Q.   When the door was closed and your hand was on the frame,
11  you realized that it was caught at that point; correct?
12  A.   Yes.
13  Q.   And when you put pulled your hand away from door that was
14  when the tip fell off; is that correct?
15  A.   Can you rephrase that?
16  Q.   I don't know how else I can rephrase it.  You pulled your
17  hand away and the tip fell off; right?
18            THE COURT:  Ask it again, maybe more slowly.
19  BY MS. KELLY:
20  Q.   When you pulled your hand away from the door where your
21  fingertip was caught, that is when the amputation of your
22  finger pad occurred; correct?
23  A.   My finger was stuck in the door.
24            MS. KELLY:  Move to strike.  Nonresponsive.  I'd like
25  the question answered.
```

```
1              THE COURT:  She's asking you when you pulled your
2    finger away from it being in that doorframe; correct?
3              THE DEFENDANT:  Yes, I had no choice.
4              THE COURT:  I didn't ask you that.  Did you pull your
5    finger away?
6              THE WITNESS:  Yes.
7              THE COURT:  And was it at that point that the
8    fingertip came off?
9              THE DEFENDANT:  Correct.
10   BY MS. KELLY:
11   Q.   Prior to that day September 19, Deputy Ynigo was a regular
12   custodial deputy on that floor that you were housed in across
13   from the shower, wasn't he?
14             MR. KISOB:  Objection, Your Honor.  Speculation.
15   Calls for speculation.
16             THE COURT:  Overruled.
17   BY MS. KELLY:
18   Q.   You may answer.
19   A.   Can you ask the question again?
20   Q.   Yes.  Prior to September 19th, the day of the accident,
21   Deputy Ynigo was your regular -- one of your regular jailers on
22   the row where you were housed; correct?
23   A.   Correct.
24   Q.   So you were familiar when he was on duty of what the
25   routine would be if they were running shower scheduling and
```

1  phone scheduling; would that be fair to say to you?

2  A.   Correct.

3  Q.   Okay.  And let's go back to the moment when you were

4  getting the shower bag returned to you.  Your laundry bag,

5  okay.  Right before Deputy Ynigo closed the door and you were

6  trying to ask him about the -- using the phone, did you hear

7  him say to you, get out of the way so I can close to this door?

8  A.   Negative.

9  Q.   Is that a "no"?

10  A.   No.

11  Q.   Did he ever say to you, move your hand before or I'm going

12  to shut the door on it?

13  A.   No.

14  Q.   Did he say to you, step away from the door and towards the

15  back of your cell?

16  A.   No.

17  Q.   Isn't it true that there are other deputies that work the

18  7000 row besides Deputy Ynigo that are called floaters or

19  people that are not regularly assigned there that are covering

20  schedules?

21  A.   Yes.

22  Q.   And so those are people that are unfamiliar to your memory

23  of helping your day-to-day activities; right?

24  A.   Yes.

25  Q.   And they act as though you're not really familiar to them

1    either, would that be fair?

2    A.    Correct.

3    Q.    And so those people -- have you ever been asked by those

4    people to present your hands for handcuffing when you are moved

5    in and out of your cell to the shower or anywhere else on that

6    floor?

7    A.    Not all of them.

8    Q.    But I'm not asking you not all of them.  I'm asking if

9    it's ever happened?

10   A.    It has happened where my old school deputies.

11   Q.    Since this accident, you're still able to hold a pen and

12   write with your hand; correct?  Because you're left-handed?

13   A.    I'm left-handed, yes.

14   Q.    All right.  And you said that you use your cane with your

15   left hand?

16   A.    Right.

17   Q.    And when you're showering, you're able to clean yourself

18   off okay?

19   A.    Yeah.  I'm reminded of the pain whenever I use my right

20   hand.

21   Q.    I'm going to ask you again, please, to just answer the

22   questions?  Mr. Jones?

23   A.    I use both my hands to shower.

24        MS. KELLY:  Your Honor, I would request again the

25   witness be instructed to answer.

```
 1          THE COURT:  She asks whether you were able to use
 2   your hand and principally the injured finger in a manner to
 3   bathe yourself.  Can you answer that yes or no?
 4          THE WITNESS:  Yes.
 5   BY MS. KELLY:
 6   Q.   You're able to still shave with without a problem;
 7   correct?
 8   A.   Yes.
 9   Q.   Clean your glasses?
10   A.   Yes.
11   Q.   Brush your teeth?
12   A.   Yes.
13   Q.   And you -- your finger that was caught in the door the
14   nail started -- it grew back, didn't it?
15   A.   Correct.
16   Q.   And you still have your bottom knuckle, your middle
17   knuckle, and your top knuckle on that same finger, don't you?
18   A.   Not my top knuckle, no.
19   Q.   Your top knuckle -- your top knuckle is still there or
20   it's not there?
21          MR. KISOB:  Objection, Your Honor, asked and
22   answered.
23          THE COURT:  Overruled.
24   BY MS. KELLY:
25   Q.   You can answer?
```

```
1   A.   I don't know what you mean by that question.
2   Q.   You have three knuckles on your middle finger.  They're
3   all still there; correct?
4   A.   Yes, they are.
5   Q.   Okay.  Now, you're claiming in this case lost earning
6   capacity from the County of Los Angeles and you have indicated
7   in this case that you want $3,150,000.00 for your inability to
8   work; isn't that correct?
9   A.   Correct.
10  Q.   And you're estimating your life expectancy to 100 years?
11  A.   Correct.
12  Q.   You're, what, 38 years old now, sir?
13  A.   Right.
14  Q.   Okay.  And let's talk about your educational and your
15  employment history, okay?  You have a high school diploma that
16  you received in the California Youth Authority; correct?
17  A.   Correct.
18  Q.   And then thereafter, you lived both in Northern California
19  and Southern California in various prisons and jails where you
20  were not living in the community; is that correct?
21  A.   Rephrase that?
22  Q.   You were living in jails and prisons --
23       THE COURT:  Ask the -- that's the question I wanted
24  you not to get into at this point.  Why can't you listen to
25  what I instructed?  You have to follow my instructions.  The
```

1    jury at the moment is instructed to disregard that last
2    question and answer.
3    BY MS. KELLY:
4    Q.    Mr. Jones, have you ever worked in the community in any
5    capacity for pay?
6    A.    I worked in my mom's apartment as a janitor.
7    Q.    Okay.  And other than that, have you held any type of --
8    you haven't held any typing or skilled labor positions since
9    you received your high school diploma; isn't that right?
10   A.    I attended Pierce College.
11   Q.    You have no degrees or certificates from any educational
12   institutions at this time; correct?
13   A.    No.
14   Q.    You attended some classes when you were pursuing your
15   certificate for paralegal school?
16   A.    Number Because I flunked that class because they tampered
17   with my mail.
18   Q.    And isn't it correct that you have no understanding as of
19   right now of when or if you will get out of prison to be
20   returned to the community?
21   A.    That's false.  I do have a date from my paid attorney.  My
22   paid attorney has brought me down for post-conviction for
23   wrongful conviction.
24        MS. KELLY:  Objection.  Move to strike.
25   Nonresponsive.

```
 1              THE COURT:  You asked him the question.  What was his
 2     understanding?  He's telling you what his understanding is.
 3     Your opened the door.  He can answer.
 4              THE WITNESS:  Answer that.  He brought me down here
 5     for -- in Valley they has me and I always plead that I was
 6     innocent so my attorney has opened up the case and I qualified
 7     for release.
 8     BY MS. KELLY:
 9     Q.   Okay.  But my specific question to is, as of right now you
10     have no release date; is that correct?
11     A.   I have not been in court in over seven months because you
12     guys won't --
13              MS. KELLY:  Objection.  Move to strike.
14     Nonresponsive.
15              THE DEFENDANT:  Because you guys wont -- for me to go
16     to Court.
17              THE COURT:  He said he hasn't been in court.  He
18     doesn't have a release date.  That was the answer.
19              MS. KELLY:  That was my question.
20              THE COURT:  He answered.
21     BY MS. KELLY:
22     Q.   And so your information on that answer will depend on a
23     court date in the future; correct?
24     A.   Next month.
25              MS. KELLY:  No further questions.
```

1          THE COURT:  Members of the jury, this may be a good
2     time to take the lunch recess.  We'll reconvene at ten to one,
3     one hour.
4          Some admonitions, don't talk to each other or anyone
5     else at home about the case until you're all together in the
6     jury room after the arguments and instructions to deliberate
7     and decide the case and don't make an effort to access anything
8     on the Internet, Google, and all that stuff.  I doubt that
9     there is anything to find but it's a violation of your oath to
10    make any effort to do that.  So have a nice lunch and we'll see
11    you at ten to one.
12         THE COURTROOM DEPUTY:  All rise.
13    (Jury exited.)
14         THE COURT:  I want to take up a few matters briefly
15    with you before we recess the lunch.  The issue was raised by
16    plaintiff about impeaching the witness, the defendant sheriff,
17    with a prior statement at trial, at the former trial, past
18    trial and there is no transcript.  However, there was something
19    that was asked of the plaintiff on Cross-examination that my
20    memory, which may not be totally clear but I'll mention what I
21    do remember, that in the prior trial the defendant deputy
22    didn't say move your hand or I'll shut the door on it, or
23    something like that.
24         Did he say that at the former trial?
25         MS. KELLY:  No, Your Honor.

```
 1              MR. KISOB:  I don't think so, Your Honor.  He didn't
 2   say that.
 3              THE COURT:  So is that something you want to ask him?
 4              MR. KISOB:  No.
 5              THE COURT:  What is it that you -- in other words, I
 6   didn't hear -- so my memory is correct then, he never did say
 7   that at the former trial.  He was asked about it now.  But you
 8   don't intend to ask him whether he said at a prior proceeding,
 9   that's how it should be addressed if it comes to that not a
10   former trial, prior proceeding.  That's vague enough.  Did he
11   say under oath that he told the plaintiff to move his hand or
12   I'll shut the door on it?
13              MR. KISOB:  No, Your Honor.
14              THE COURT:  You don't intend to get into that?
15              MR. KISOB:  I -- I -- that's not something --
16              THE COURT:  Answer my question.  I'm tired of your
17   not being responsive.  Answer the question.
18              MR. KISOB:  Forgive me, Your Honor.
19              THE COURT:  I'm not going to forgive you readily
20   because I don't think you're being properly responsive.
21              MR. KISOB:  I'm sorry, Your Honor.
22              THE COURT:  Listen to what I'm asking.  It's a
23   straightforward question.  Do you intend to ask him that
24   question?
25              MR. KISOB:  I intend to.
```

1           THE COURT:  First, you said you're not, now you're

2    saying you are.

3           MR. KISOB:  I was saying --

4           THE COURT:  Take the lectern.

5           MR. KISOB:  Your Honor, I was saying that I don't

6    remember pressing him on that issue during the last trial but I

7    intend to do so now.  So it doesn't come within the sphere of

8    what we're discussing.  That is what I was trying to say.

9           THE COURT:  So in other words, what I raised was

10   something you hadn't thought about?

11          MR. KISOB:  No, no, Number I thought about it.

12          THE COURT:  Then why is it so complicated?  Were you

13   intending to ask him, the deputy, the defendant, on

14   Cross-examination, did you at a prior proceeding tell the

15   plaintiff move your hand or I'll shut the door on it?

16          MR. KISOB:  I intend to ask him that.

17          THE COURT:  And he may say, no, I didn't or he may

18   say, I did.  I forgot to say it at the last trial.  I don't

19   know.  What's your position regarding that?  That doesn't seem

20   -- that was a point that I remember and it seems different than

21   what he said but I think you're stuck with his answer.  In

22   other words, I don't know how he's going to answer.  Whichever

23   way he answers, there is no way to look at a transcript and

24   say, you didn't do it, you didn't say that but you intend to

25   ask him that?

```
 1              MR. KISOB:  No, Your Honor.
 2              THE COURT:  All right.  What's your position on that?
 3              MS. KELLY:  Your Honor, I don't recall either from
 4    the prior proceeding.  If he wants to ask that question, the
 5    deputy can answer it.
 6              THE COURT:  All right, then.  We resolved that.  Now
 7    what else -- there is no transcript, so what else are you
 8    intending to inquire about that may relate to testimony at the
 9    former trial?
10              MR. KISOB:  Your Honor, based on the fact that the
11    statements he made during the first trial are statements made
12    by a defendant so they're statements of a party opponent, it is
13    our position that we can at any time ask him about statements
14    that he's made, because they are not hearsay.  They are not
15    hearsay by this --
16              THE COURT:  In other words, you are saying you can
17    ask him whether he said -- what specifically are you going to
18    ask him about regarding what he said at a former trial.  But
19    you don't know what is he's testifying to at this trial.  Let's
20    assume that he testifies at this trial in the same or
21    substantially the same way he did at the former trial.  Then
22    you wouldn't have any questions.
23              MR. KISOB:  I wouldn't have any problem with that,
24    Your Honor.
25              THE COURT:  Is that his intention?
```

```
 1              MS. KELLY:  As best I can understand, yes, Your
 2    Honor.
 3              THE COURT:  What is hard to understand about that?
 4    What is hard to understand about that?  Think about the
 5    question.  Don't talk over me.
 6              MS. KELLY:  Because the implication --
 7              THE COURT:  You talk over me constantly.  Don't do it
 8    anymore.  When I speak, wait.  You always have a chance to
 9    respond.  I don't let anyone not have their day in court here.
10        So the question is, is he going to testify in the same way
11    or substantially the same way he testified at the former trial?
12              MS. KELLY:  Yes.
13              THE COURT:  Well, there shouldn't be an issue except
14    for the one that I raised myself.  Which I'm not an advocate
15    but that is something I remember.  Now, with regard to the
16    grievance, what's the relevance of the grievance?  This
17    happened after the event and the grievance would undoubtedly be
18    a narration of what he has testified to.
19              MR. KISOB:  Number Your Honor -- yes, as to the
20    grievance about the incident, fine.  That's okay. The result --
21              THE COURT:  What does that's okay mean?
22              MR. KISOB:  I -- I align my thoughts with those of
23    the Court.  It doesn't necessarily have to come in because
24    we're in court today because of the grievance is the same fact.
25              THE COURT:  Wait one minute.  There are two
```

1    grievances here and I want to isolate them.  There is the
2    grievance that preceded the event and that was what his wife
3    made the grievance on his behest and then there appeared to be
4    a grievance he filed after the event.  I'm referring to the
5    grievance after the event.
6            MR. KISOB:  Correct, Your Honor.
7            THE COURT:  What is the relevance of that?
8            MR. KISOB:  That's why I say, for today, based on
9    your ruling, I am okay with not introducing that anymore.
10            THE COURT:  All right.  Then that resolves that.
11    Were there any other matters that need addressing?  Just let me
12    look at my notes.
13            MR. KISOB:  Your Honor?
14            THE COURT:  One minute.  Oh, yes, there was the
15    question of -- about his having spent most of his life in
16    prison.  What is the relevance of that?  I'm asking the
17    defense.
18            MS. KELLY:  Your Honor, it goes to the issue of the
19    lost future earnings claim and I was very careful in both the
20    prior proceeding and --
21            THE COURT:  Don't go on.  You answered and you said
22    -- I didn't ask you about the prior proceeding.  I asked you
23    what's the relevance.  You answered directly and then tried to
24    elaborate.  You said it relates to lost earnings.  So the way I
25    see the relevance from your standpoint is that because he spent

1  most of his life in prison so far, he's likely to spend most of

2  the rest of his life in prison.  Is that the relevance?

3          MS. KELLY:  Yes.

4          THE COURT:  Well, I mean, isn't that sort of a leap?

5  How do we know?  Maybe he'll reform, maybe he'll not be in

6  prison.  I think you're asking the jury to accept because he

7  has led a criminal life up to this point, he must be in his 40s

8  now I would guess -- how old are you, Mr. Jones?

9          THE WITNESS:  I'm 38.

10          THE COURT:  38 years old, so you're saying the

11  chances are pretty strong or more likely than not that he's

12  going to spend the rest of his life in jail or substantial part

13  of it.  That's your argument?

14          MS. KELLY:  Not quite, Your Honor.

15          THE COURT:  What is it then?

16          MS. KELLY:  The argument is that because of the lack

17  of historical employment for pay whether it was in custody or

18  in the community, there is no basis from which to calculate the

19  $3,000,000 future earnings --

20          THE COURT:  But you asked him about his prior

21  employment so you have to argue from.  I'm going to not allow

22  you to get into that question, not to ask that question.  I

23  don't think it's sufficiently relevant.  All right.  Then we'll

24  come back at ten till one.  Yes?

25          MR. KISOB:  Your Honor, we still have the grievance

 1    that was filed before the incident to address.

 2              THE COURT:  That's admitted.

 3              MR. KISOB:  The grievance filed before the incident

 4    is not admitted, Your Honor.

 5              THE COURT:  No, it is admitted.

 6              MR. KISOB:  You told us to wait and discuss.

 7              THE COURT:  Number I was referring to this grievance,

 8    to the grievance that follows the incident and there it

 9    appeared to me he was just relating his upset with what

10    happened?  Isn't that right?

11              MR. KISOB:  Yes, but it wasn't admitted, Your Honor.

12              THE COURT:  But why should be it admitted?

13              MR. KISOB:  Because we're trying to show there was

14    some element of maliciousness that the deputy knew that he had

15    filed a grievance complaining about --

16              THE COURT:  You are mixing up two different

17    grievances.  The one that was filed by wife before I will admit

18    but there seems to be a grievance that you're trying to

19    introduce after the event; is that right?

20              MR. KISOB:  Well, there is three -- so one of the

21    grievances --

22              THE COURT:  The first one is admitted.

23         (A discussion was held off the record.)

24              THE COURT:  Go ahead.

25              MR. KISOB:  Your Honor, we have the result granting

1  the grievance that we were not able to introduce because you

2  said we should hold off and then the grievance --

3         THE COURT:  I can't follow what you're saying.  I'm

4  making every effort I can.  Let's start from the beginning.

5  There are two sets of grievances.  There's the grievance that

6  his wife filed a day or so before the event in which she named

7  the defendant deputy.  I am going to allow that grievance in

8  evidence if it hasn't already been in evidence.  Is it in

9  evidence?

10        MS. KELLY:  Your Honor, it is not but it did not name

11 this deputy.

12        THE COURT:  I thought it named Ynigo.

13        MS. KELLY:  We're referring to the one filed by the

14 spouse, it was to the staff in general.  There was nothing

15 specific --

16        THE COURT:  Oh, I see.  Well, then if it wasn't with

17 regard to -- just the staff generally, how much before the

18 incident was this grievance filed?

19        MR. KISOB:  Two dates.

20        MS. KELLY:  There was dispute on the date by a year

21 and their contention was this is a typo but it was --

22        MR. KISOB:  Your Honor, it was filed on the 17th of

23 September last year, two days before the incident but his wife

24 made a mistake and put 2024 instead --

25        THE DEFENDANT:  Number I have 2023 right here.

```
1              MR. KISOB:  The document that we have showed 2024,
2    Your Honor.
3              THE COURT:  Well, that couldn't be.  I mean, that
4    didn't happen then.  So it had to be a typo; correct?
5              MR. KISOB:  It was a typo, Your Honor.  That's what
6    we're saying so it was two days before the incident?
7              THE COURT:  Sit down.  I'll give you a chance to
8    speak.  So the grievance by the wife was filed two days before
9    the --
10             MR. KISOB:  Incident.
11             THE COURT:  Event?
12             MR. KISOB:  Yes, Your Honor.
13             THE COURT:  Ill allow it in evidence even if it
14   doesn't mention the deputy because the defense can ask the
15   deputy whether he knew about that grievance and if he doesn't
16   know about the grievance, then it wouldn't affect his animus,
17   if he had any.  And what about this grievance that I saw on the
18   screen that came after the event?
19             MR. KISOB:  That is the grievance for the incident.
20             THE COURT:  What is the relevance of that?
21             MR. KISOB:  That is out.
22             THE COURT:  Why did you show it on the screen?
23             MR. KISOB:  We're trying to bring it in but we -- the
24   Court directed us and now we've aligned our thoughts with those
25   of the Court and we agree that --
```

```
 1          THE COURT:  Then it's not -- we resolved it?
 2          MR. KISOB:  Yes.  But the result of the grievance,
 3   Your Honor, where the County says, we are granting it, I means
 4   they're saying that we have investigated this and we believe
 5   you and we think that what he did was wrong.  That goes to show
 6   liability.
 7          THE COURT:  So you're saying, that -- I didn't hear
 8   this that at the first trial, you're saying that the grievance
 9   was adjudicated and it was found in favor of the plaintiff?
10          MR. KISOB:  Yes, Your Honor.
11          THE COURT:  Is that so?
12          MS. KELLY:  Your Honor, the grievance?
13          THE COURT:  Is that so?
14          MS. KELLY:  I would like to be heard to give you --
15          THE COURT:  I am asking you first, is what he said
16   true then you can explain.
17          MS. KELLY:  It's true but not for the reasons stated.
18          THE COURT:  What was the -- why was the grievance
19   granted?  Why was it -- why did -- what happened?  What did the
20   County say?
21          MS. KELLY:  Deputy Ynigo did not have his radio on
22   his person at the time of the incident.  He was supposed to
23   have his radio with him.
24          THE COURT:  So am I understanding that Deputy Ynigo
25   was reprimanded or critiqued for not having radio on him at the
```

```
 1   time?
 2            MS. KELLY:  Yes.
 3            THE COURT:  Is that right?
 4            MS. KELLY:  Yes.
 5            THE COURT:  But the grievance, you can correct me
 6   either side, would not appear to relate to whether the deputy
 7   had the radio on him or not; isn't that correct?
 8            MR. KISOB:  That is correct, Your Honor.
 9            THE COURT:  Well then, why is it relevant?  In other
10   words, he was disciplined for something that didn't relate to
11   the grievance.
12            MR. KISOB:  The grievance had nothing to do with the
13   radio.  They would not grant the grievance that has nothing to
14   do with the radio.
15            THE COURT:  One second here.  Take the lectern
16   Ms. Kelly.  Now listen to my question clearly.  The grievance
17   that we're discussing was a grievance that the plaintiff filed
18   after the incident on September, was it 17th?  When was the
19   incident?
20            MS. KELLY:  18th.
21            DEFENDANT'S WIFE:  19th.
22            MR. KISOB:  19, Your Honor.
23            THE COURT:  How long after the incident was the
24   grievance filed?  What date is on the grievance?  What's the
25   date?
```

```
1              MR. KISOB:  Sorry, Your Honor.
2              MS. KELLY:  I have the received date --
3              THE COURT:  I didn't ask you.
4              MR. KISOB:  Your Honor, the grievance was submitted
5    on September 21, 2023, two days after.
6              THE COURT:  Three days after.
7              MR. KISOB:  Two days, Your Honor.
8              THE COURT:  Two days.
9              MR. KISOB:  The event happened September 19.
10             THE COURT:  Two days after, okay.  In this grievance
11   without getting into the details, did the -- was the principle
12   allegation that the plaintiff had the door slammed on his
13   finger?
14             MR. KISOB:  Yes, Your Honor.  I --
15             THE COURT:  Yes.  Okay.
16             MR. KISOB:  The thing is, I want to help the Court
17   not to go on and on because they misled the Court, Your Honor.
18   The grievance says here that the reason why it was granted was
19   because the employees' conduct should have been different.  His
20   conduct should have been different.  Upon examining the
21   grievance, it was granted and they checked the box saying --
22             THE COURT:  I didn't get to that yet.  I just asked
23   you the question, in the grievance did he essentially state
24   what his complaint is in this trial?
25             MR. KISOB:  Yes, Your Honor.
```

```
 1              THE COURT:  Okay.  Let that be for the moment.  How
 2   was that grievance adjudicated or  was it adjudicated?  What
 3   was the result?
 4              MS. KELLY:  As I stated, this is exhibit that he
 5   should have had his radio and he didn't.  That's the reason
 6   why there was an issue with him deciding to do what he did
 7   because had he had a radio or someone with him on the 7000 row
 8   --
 9              THE COURT:  Was there a written adjudication?
10              MS. KELLY:  The result of the grievance is this.
11              THE COURT:  Mr --
12              MR. KISOB:  Kisob, Your Honor.
13              THE COURT:  Kisob.  Do you have a written response to
14   the grievance?  Is there something in writing that the County
15   responded to with regard to his grievance?
16              MS. KELLY:  29.  Page 29.
17              MR. KISOB:  Your Honor, I have a document here which
18   says Synopsis.
19              THE COURT:  Hand it up.
20              MR. KISOB:  Okay.
21              THE COURT:  The document which I'll mark as Court's
22   Exhibit 2.  It's a synopsis of the grievance.  It's titled
23   Notification of Disposition and the incident of disposition
24   portion says, quote, this grievance is a duplicate of another
25   grievance you have submitted which is still being processed.
```

```
1    So was any grievance processed here?  Is there a determination
2    made from these grievances?  This is not a determination.  This
3    just says, Exhibit 2 --
4             MS. KELLY:  Your Honor, I'm trying to understand what
5    the Court is holding Exhibit 2?
6             THE COURT:  Exhibit 2 is just a notification of
7    disposition.  It's -- anyway, regardless of Court's Exhibit 2,
8    is -- the question is there it says that it's a duplicate of
9    another grievance you have submitted which is still being
10   processed.  Was the other grievance similar in the sense that
11   it was a complaint about the door being slammed on his finger?
12            MR. KISOB:  Yes, Your Honor.
13            THE COURT:  And how was that -- was any grievance
14   ever adjudicated?
15            MR. KISOB:  Yes.
16            THE COURT:  Do you have copy of some adjudication?
17            MR. KISOB:  Yes.
18            THE COURT:  Hand it up.
19            MR. KISOB:  Yes.
20            MS. KELLY:  What are giving?
21            MR. KISOB:  Exhibit 12.
22            MS. KELLY:  Bates stamp 43?
23            THE COURT:  Well, I'm going to mark this as Court's
24   Exhibit 3.
25            MS. KELLY:  Which one is that that the Court is
```

1    referring?

2            THE COURT:  This is the Result of Inmate Grievance

3    Against Staff Review and it's -- it doesn't -- it has a date of

4    January 24, 2024, and it has a bunch of boxes under Review

5    Disposition and the box that is checked is Employee Conduct

6    should have been different and it says in paren, "Employee's

7    actions were not in compliance with established procedures,

8    policy guidelines and training.  The Watch Commander or

9    Supervising Lieutenant will take appropriate actions."

10            I don't know what procedure or policy or training was

11    involved.  And then it says, "Internal Affairs initiated."  In

12    other words, the disposition was approved in the sense that it

13    was going to be further investigated.  What happened with that

14    further investigation?

15            MS. KELLY:  Negative, Your Honor.  He was just taken

16    off the row at the request of the plaintiff's family and he's

17    still there working in another location.

18            THE COURT:  In other words --

19            MS. KELLY:  It was investigated.

20            THE COURT:  Was there a written conclusion or

21    something?

22            MS. KELLY:  No, Your Honor, as I indicated earlier.

23    There was verbal reprimand about you need to have your radio

24    with you on that floor.

25            THE COURT:  So that was the result of the Internal

```
1    Affair investigation?
2              MS. KELLY:  Yes, because there was --
3              THE COURT:  Yes?  The answer is yes?
4              MS. KELLY:  Yes.
5              THE COURT:  This woman here with the glasses is
6    feeding you the answers.  Take the lectern.  You, take the
7    lectern.  You seem to know what is what here because you're
8    tutoring her on the answers.  Give us your name.
9              MS. PERILLA:  My name is Bridgette Perilla.
10             THE COURT:  What is your position?
11             MS. PERILLA:  I'm a paralegal for Ms. Kelly.
12             THE COURT:  Do have answers to the questions that I'm
13   asking?
14             MS. PERILLA:  I wasn't feeding her answer.  I was
15   just handing her a blank note pad.
16             THE COURT:  Oh, I see.  I misunderstood.  I
17   apologize.  I don't have any disposition here.  The
18   representation is that it was the radio.  That would appear to
19   be consistent with the fact that he's on that duty.  Is he
20   still on that duty now?
21             MS. KELLY:  He's not on that floor but he's still at
22   the jail.
23             THE COURT:  This further grievance cannot be
24   explored.  It cannot be explored.
25             MR. KISOB:  Sorry, Your Honor.  You already admitted
```

```
 1    it into evidence.
 2              THE COURT:  I can't hear you.
 3              MR. KISOB:  You admitted it into evidence.
 4              THE COURT:  You know something, you are at this point
 5    really becoming irksome.
 6              MR. KISOB:  Forgive me.
 7              THE COURT:  You are really becoming irksome.  I can't
 8    tell whether you're trying to shine me on or whether you really
 9    don't understand.  It would appear to me from all the questions
10    I've asked and trying to separate the two grievances that
11    you're trying to confuse the issue.  If you do that again, I am
12    going to have to take some appropriate measures.  There is no
13    disposition and so you cannot get into any grievance after the
14    event.  Is that clear?
15              MR. KISOB:  Yes, Your Honor.
16              THE COURT:  That's it.  Lunch.
17              THE COURTROOM DEPUTY:  All rise.
18        (Whereupon a lunch recess was taken.)
19              THE COURT:  Present.  The defendant is being brought
20    out.  What is your name, ma'am?
21              MS. RIOS:  Nanci Rios.
22              THE COURT:  Come forward.  Take the witness stand.
23    Just want you to be seated for a moment.
24              THE WITNESS:  Okay.
25        (A discussion was held off the record.)
```

```
1          MR. KISOB:  Your Honor, may I be heard?

2          THE COURT:  Yes.

3          MR. KISOB:  I just wanted to address the Court in

4    regards to the two inmates who are prisoners, Mr. Gay and

5    Mr. Turner.  So I did send the writ to both housing facilities

6    where inmates are.  With Mr. Gay, I have -- they have informed

7    me that he'll be able to testify.  I just need to provide them

8    with the time slot.

9          As to Mr. Turner, it has been hurdle after hurdle.

10   They keep coming up with new things.  First, they said they

11   needed the Court to send it directly to them.  I sent it to

12   Mr. Cruz who thankfully did so.  I called this morning to

13   confirm that Mr. Turner would be testifying and I was told that

14   they had been heard back from the Court.  I said well, Mr. Cruz

15   informed me yesterday that he informed them.  Later on they

16   said, well, they sent another email to the Court this morning.

17   They are waiting to hear back from the court.  I said, I feel

18   like they're doing everything that they want to do to preclude

19   the witness from testifying and I said I was going to be

20   opening an investigation if they don't allow him to testify.

21         THE COURT:  Mr. Cruz said you phoned him yesterday

22   about this.  When did you start the process?

23         MR. KISOB:  As soon as I received it.  As soon as the

24   writ was issued.

25         THE COURT:  When was the writ issued?
```

```
1              MR. KISOB:  I think about the four -- the same day
2     the court ordered a new trial.  This trial, Your Honor, which
3     should be about a week ago.
4              THE COURT:  Well, if he's not here, he's not here.  I
5     can't control it.  He's not that essential a witness anyway.
6     Gay is the more important witness.  It's your responsibility to
7     get him here.  I can't open investigations about why he's not
8     here now.  We've gone through this several times.  We went
9     through it at the last trial.  I don't know what went on
10    between you and the prisoners, the prison.  I can't get
11    involved with that specifically at this point.
12             (Defendant appeared.)
13             THE COURT:  Okay.  Swear this witness in.
14             THE COURTROOM DEPUTY:  Sir?
15             THE COURT:  No, no, Number This witness, swear her
16    in.
17             THE COURTROOM DEPUTY:  Do you solemnly swear that the
18    testimony you shall give in the cause now before this Court
19    shall be the truth, the whole truth, and nothing but the truth
20    so help you God?
21             THE WITNESS:  Yes.
22             THE COURTROOM DEPUTY:  Please speak into the
23    microphone.  State your name and spell it for the record?
24             THE WITNESS:  Nanci, N-A-N-C-I, Rios, R-I-O-S.
25             THE COURT:  And law enforcement who have been here
```

1    during the trial have witnessed you using your cell phone
2    during the trial, were you?
3            THE WITNESS:  I was texting.
4            THE COURT:  Answer the question.
5            THE WITNESS:  Yes.
6            THE COURT:  And were you recording the proceedings?
7            THE WITNESS:  No.
8            THE COURT:  Were you videotaping the proceedings?
9            THE WITNESS:  No.
10           THE COURT:  Why were you using your cell phone?
11           THE WITNESS:  I was taking a picture of my husband.
12           THE COURT:  It's not proper to use the cell phone
13   during -- to take pictures of a Court proceeding.  You are
14   violating a Court order.
15           THE WITNESS:  Okay.
16           THE COURT:  Which deputy observed her using the cell
17   phone?
18           MALE VOICE:  Here, Your Honor.
19           THE COURT:  Come forward.  Identify yourself.
20           DEPUTY KENNEDY:  Yes.  Deputy Adam Kennedy, L.A.
21   County Sheriff's Department of Men's Central Jail.
22           THE COURT:  And you're under oath also.
23           DEPUTY KENNEDY:  Yes, Your Honor.
24           THE COURT:  What did you observe?
25           DEPUTY KENNEDY:  I observed Ms. Rios holding up her

```
1    phone and the camera app open.
2              THE COURT:  Is the camera app different than the
3    video app?
4              DEPUTY KENNEDY:  With the camera app, you can take
5    videos or pictures.  So I don't know which --
6              THE COURT:  Are you taking videos?
7              THE WITNESS:  I took a small video of my husband.
8              THE COURT:  You know you are in violation of a Court
9    order.  I'm going to issue an order to show cause when this
10   trial is complete why you shouldn't be sanctioned.  There is a
11   sign outside that you're not supposed to do that.  When you
12   come into the courthouse, there is a signage about the use of
13   videos and cell phones.
14             THE COURTROOM DEPUTY:  I also advise that the people
15   in the audience about the use of cell phones in the courtroom.
16             THE COURT:  Before the trial?
17             THE COURTROOM DEPUTY:  Yes.
18             THE COURT:  So you are going to have to answer to
19   that.  I can't deal with it now.  I want you to give your
20   contact information to Mr. Cruz.  You can be seated.
21             THE WITNESS:  Uh-huh.
22             DEPUTY KENNEDY:  Do you still need me, Your Honor?
23             THE COURT:  No, sir.  Thank you.  Give your name to
24   Mr. Cruz, too.  I mean, your contact information.
25             DEPUTY KENNEDY:  Yes, sir.
```

```
1              THE COURT:  All right.  Thank you.
2              Actually, I'm going to bar her from the courtroom.
3   Tell her she has to leave.
4              THE COURTROOM DEPUTY:  You're not allowed to come
5   back into the courtroom.
6              MR. KISOB:  Your Honor, may I speak in her defense?
7              THE COURT:  Yes.
8              MR. KISOB:  Your Honor, please, it is the first time
9   she's done this.  Would ask that the Court forgive her.
10             THE COURT:  I'm not excusing her.  There are three
11  differ warnings.  I don't want someone here who's willfully
12  violating orders and taking videos of the proceedings.  She's
13  barred from this trial.
14             MR. KISOB:  During the first trial, Your Honor, I
15  think one of the deputies or the Marshals used his phone and
16  was reprimanded and he stopped using it.  I don't remember
17  which one.  So in all fairness --
18             THE COURT:  Well, he may have been using his phone to
19  communicate --
20             MR. KISOB:  He was recording.
21             THE COURT:  I don't know if he was.  Get the jury.
22  Let's go.
23             THE COURTROOM DEPUTY:  Yes, Your Honor.
24             MR. KISOB:  Your Honor, may I be heard?
25             THE COURT:  Yes.
```

1          MR. KISOB:  Just one last point, Your Honor.  When I

2     spoke to the state prison in Delano, they said they needed one

3     last call from the Court confirming that they needed

4     Mr. Turner.  They wouldn't believe me.

5          THE COURT:  This is a re-do of the last trial.  We

6     had hours of delays and the Court doing what you should have

7     been doing to get your witnesses before the jury then.  This is

8     the same and I gave you ample warning.

9          THE COURTROOM DEPUTY:  Please be seated.

10        (Jury entered.)

11         THE COURT:  Sorry for the delay.  I mean to keep my

12    word about the time but we had something to take up.  We're

13    ready to proceed.  We ready for another witness or where are

14    we?

15         MR. KISOB:  I think the plaintiff will be redirecting

16    plaintiff briefly.

17         THE COURT:  Redirect.  Only on new matters that were

18    raised on Cross.

19         MR. KISOB:  Your Honor, I was trying to admit into

20    evidence the exhibit you allowed us to admit.

21         THE COURT:  I can't hear you.

22         MR. KISOB:  Exhibit Number 12.  The Court said we can

23    bring that in.  That's what I'm trying to bring in.

24         THE COURT:  What is 12?

25         MR. KISOB:  It's the grievance that was filed two

1    days before the incident.

2              THE COURT:  Two days before?

3              MR. KISOB:  Yes, Your Honor.

4              THE COURT:  All right.  That's in evidence.

5              MR. KISOB:  Then no need to redirect.

6              THE COURT:  All right.  We're ready for the next

7    witness.  Right?  Call the next witness.

8              MR. KISOB:  Your Honor, the plaintiff will call -- I

9    was going to call Mr. Turner but I need to call to confirm.

10             THE COURT:  Call the next witness.  Somebody.  The

11   plaintiff will call Mr. Ynigo, Deputy Ynigo?

12             THE COURTROOM DEPUTY:  Will the witness please stand

13   behind the court reporter? Raise your right hand.

14        Do you solemnly swear that the testimony you are about to

15   give in the cause now before this Court shall be the truth, the

16   whole truth, and nothing but the truth, so help you God?

17             THE WITNESS:  I do.

18             THE COURTROOM DEPUTY:  Thank you.  Please take a

19   seat.  Watch your step going up the stairs.  Speak into the

20   microphone.  Speak and spell your name for the record.

21             THE WITNESS:  My name is Ira Ynigo, I-R-A, Y-N-I-G-O.

22                         CROSS-EXAMINATION

23   BY MR. KISOB:

24   Q.   Deputy Ynigo, good afternoon.

25   A.   Good afternoon, sir.

1  Q.    Why did you kick the door shut on my client's finger on
2  September 19, 2023?
3  A.    Sometimes the door needs assistance.  It is not something
4  we do every time.  The doors are old.  The jail was built in
5  1950.  I had to use my foot to assist the door to shut and make
6  sure it was secured.
7  Q.    Isn't it true that when you initially opened the door to
8  take my client to the shower -- sorry.
9        When you took him back into his cell after he had had his
10 shower, you didn't close the door by using your foot; correct?
11 A.    Correct.
12 Q.    When you opened Mr. Gay's door and asked that -- to let
13 him out so he could go take a shower you did you not close the
14 door; correct?
15 A.    For Mr. Gay, I did not.
16 Q.    You were the deputy that took the plaintiff out of his
17 cell so he could go take a shower on September 19, 2023;
18 correct?
19 A.    Correct.
20 Q.    And after you left him in the shower, you walked out of
21 the floor?
22 A.    I did not leave the floor, no.
23 Q.    What did you do next?
24 A.    After the incident?
25 Q.    Yes.

1   A.   Directly after the incident, I secured the second inmate
2   because I can't leave the row without and I went to go call for
3   paramedics.
4   Q.   No, Number I mean, after you took him out to take a shower
5   before the underlying incident.  So you took him out to go take
6   a shower?
7   A.   Yes.
8   Q.   What did you do after that when you left him in the shower
9   area?  What did you?
10  A.   The first time he was in the shower.  I was doing other
11  line duties, other responsibilities on the floor, pill calls,
12  Title 15's.
13  Q.   And you went back to the shower area because you had been
14  told that plaintiff was being recalcitrant; correct?
15  A.   From my Sergeant, yes,
16  Q.   And you would agree with me that when you're told that a
17  prisoner is being recalcitrant, the way you would approach that
18  situation is very different from the way you would approach it
19  normally if you were just going to see him and take him out;
20  correct?
21          MS. KELLY:   Objection.  Argumentative.  Lacks
22  foundation.
23          THE COURT:   Overruled.
24  BY MR. KISOB:
25  Q.   You may answer.

1   A.    I would say yes/no, it depends.

2   Q.    When you went back after you had been told that plaintiff

3   was being recalcitrant, where did you meet the plaintiff?

4   A.    In the shower with my Sergeant.

5   Q.    Was there anyone inside the shower when you initially put

6   plaintiff in there?

7   A.    No, there was not.

8   Q.    So what do you -- did you understand recalcitrant in this

9   context to mean?

10  A.    It can mean anything.

11  Q.    So it can mean that plaintiff was in the shower by himself

12  and being recalcitrant to himself and by himself alone?

13  A.    Yes.

14  Q.    Okay.  And when you got to the shower, the plaintiff --

15  you took the plaintiff out; correct?

16  A.    Yes.

17  Q.    Did you ask him anything about why he was allegedly being

18  recalcitrant?

19  A.    No.

20  Q.    Did you make any inquiry as to what the recalcitrant was?

21  A.    No, I had no context.

22  Q.    And the plaintiff used a cane to walk back into his cell;

23  correct?

24  A.    I believe so, yes.

25  Q.    And when you closed the cell door, you did not use your

1  floor; correct?

2  A.    On that occasion, I did not.

3  Q.    And isn't it true that the plaintiff was asking you when

4  he would be allowed to continue to use the phone?

5  A.    I don't remember the exact conversation we had.

6  Q.    Did you have a discussion or conversation with the

7  plaintiff relating to the use of the phone that was standing

8  right in front of plaintiff's door?

9  A.    I'm sure it was about phone.  Every day it's usually about

10  the phone with him --

11  Q.    Number On this particular day, when you took him back into

12  his cell from when he just had a shower, wasn't there a

13  conversation relating to plaintiff's use of the phone?

14  A.    Yes.

15  Q.    And what did you tell him?

16  A.    I most likely told him not right now because I'm doing

17  shower program.

18  Q.    Okay.  Isn't it true that even when other inmates are

19  using the shower, plaintiff would be able to use the phone if

20  it was his time?

21  A.    Yeah, depends on the day, how much staffing we have.

22  Q.    So why did you not allow him to use the phone?

23  A.    Probably because we were short-staffed and I didn't have

24  the personnel to run both programs at the same time.  The phone

25  is a privilege.

1    Q.   Isn't the phone station standing right in front of
2    plaintiffs cell door? Just by the side?
3    A.   He was using it before he got in the shower, so yes, it
4    was.
5    Q.   What --
6    A.   I moved it.
7    Q.   What additional staffing needs did you require to enable
8    him to use phone?
9    A.   Because it's a different program.  It's a privilege.
10   Q.   So but if he had to use the phone, would it have require
11   the presence of another employee or Sheriff's Deputy or
12   something to stand there while he used the phone?
13   A.   No, of course not.
14   Q.   So I just want you to explain why you would have needed
15   additional staff members to be there while he used the phone.
16   A.   Because when they're done with the phone, the deputies
17   have to move said phone.  So it hinders our time to do our
18   other tasks so it's adding responsibility.
19   Q.   Moving a phone -- you would agree that moving that phone
20   would not have taken more than three, four, or five seconds;
21   correct?
22   A.   Yes.  But I have to do a Title 15 compliance walk every 30
23   minutes, and time is very precious to us.
24   Q.   At that time, you were letting prisoners out to, you know,
25   get a shower; correct?

```
1   A.   Yes.
2   Q.   So you I were on that floor; correct?
3   A.   Yes.
4   Q.   How long have you been a Sheriff's deputy?
5   A.   Over four years.
6   Q.   And within this time you've worked exclusively for the
7   County of Los Angeles?
8   A.   Yes.
9   Q.   Have you worked only at the Men's Central Jail?
10  A.   Number I've worked at Twin Towers as well.
11  Q.   Have you been involved in any lawsuits relating to the
12  performance of your duties?
13  A.   No, never.
14  Q.   Except for this one?
15  A.   Just this one.
16  Q.   Please turn to Exhibit Number 1.  Do you have that open in
17  front of you?
18  A.   Yes, I do, sir.
19  Q.   Have you seen this document before?
20  A.   Yes, I have, sir.
21  Q.   What is the document?
22  A.   This is a inmate injury or illness report.  If someone
23  were to slip in the shower or be injured in a fight or anything
24  that involves injury, we have to fill this out.
25  Q.   At the bottom left of the document page one of the
```

1   document, is that your name?

2   A.   Yes.

3        MR. KISOB:  Your Honor, at this time plaintiff moves

4   to introduce into evidence Exhibit Number 1.

5        THE COURT:  Any objection?

6        MS. KELLY:  No objection, Your Honor.

7        THE COURT:  Received.

8   (Exhibit 1 was received into evidence.)

9   BY MR. KISOB:

10  Q.   Mr. Ynigo, please turn to Exhibit Number 8 which is in

11  evidence already.

12  A.   Yes.

13  Q.   You have seen this sign before; correct?

14  A.   Correct.

15  Q.   The sign basically requires that each time you remove an

16  inmate from the cell to go get a shower or something, or each

17  time you move an inmate from their housing location, you have

18  to put them in handcuffs; correct?

19  A.   Yes.

20  Q.   Did you put Mr. Jones on the handcuffs on the day of the

21  incident?

22  A.   I did not.

23  Q.   Did you put Mr. Gay in handcuffs on the day of the

24  incident?

25  A.   I did not.

```
1   Q.   Can you please turn to Exhibit Number 10?  Have you seen
2   this document before?
3   A.   Yes.
4   Q.   What is it?
5   A.   That is a unit order.
6   Q.   And you were given this at the jail; correct?
7   A.   Yes.
8   Q.   And isn't it true that this document establishes
9   procedures regarding jail security at Men's Central Jail?
10  A.   Yes.
11          MR. KISOB:  Your Honor, plaintiff moves to admit into
12  evidence Exhibit Number 10.
13          THE COURT:  Received.
14          MS. KELLY:  Objection, Your Honor.  It's actually
15  Exhibit 9 just for clarity of the record.
16          THE COURT:  The same is exhibit is in evidence?
17          MS. KELLY:  It's the same evidence but it's Exhibit 9
18  not 10.
19          THE COURT:  Was it introduced in earlier testimony?
20          MS. KELLY:  Number On the joint exhibit list, it is
21  identified as Exhibit 9 not 10.
22          MR. KISOB:  It's Exhibit 9 on their new exhibit list.
23  I'm going by what we have in trial --
24          THE COURT:  You've identified what it is.  Whether
25  it's 9 or 10, you've described what it is; correct?
```

```
 1              MR. KISOB:  Exhibit Number 10 is --
 2              THE COURT:  The exhibit you are showing this witness
 3   what is the caption of it?
 4              MR. KISOB:  The caption says, Los Angeles County
 5   Sheriff's Department Custody Services Division, General
 6   Population Men's Central Jail Unit Order 307001.
 7              THE COURT:  That identifies it for the record.  It's
 8   received as nine, or ten but it's received.
 9         (Exhibit 10 received into evidence.)
10   BY MR. KISOB:
11   Q.   Mr. Ynigo, please turn your attention to Exhibit Number
12   16, and this is Unit Order 517044.  Have you seen this document
13   before?
14   A.   Yes, sir, I have.
15   Q.   And isn't it true that it is a document meant to set forth
16   the policies and procedures of Men's Central Jail regarding the
17   operation of all general housing locations?
18   A.   Yes.
19              MR. KISOB:  Your Honor, plaintiff moves to admit into
20   evidence Exhibit Number 16, Unit Order 517044.
21              THE COURT:  It's received.
22         (Exhibit 16 was received into evidence.)
23   BY MR. KISOB:
24   Q.   Mr. Ynigo?
25   A.   Yes, sir.
```

1    Q.    When -- so shortly after you put plaintiff back in his

2    cell, you went back and collected his shower bag; correct?

3    A.    Yes.

4    Q.    And at the time when you collected that shower bag,

5    plaintiff's cell door was closed; correct?

6    A.    Yes.

7    Q.    And you had initially shut his tray slot; correct?

8    A.    Yes.

9    Q.    Why did you close the tray slot?

10    A.    The Sergeant ordered me to that was standing there next to

11    me.

12    Q.    Just a moment.  Do you know why he ordered you to close

13    it?

14    A.    No, I do not.

15    Q.    Isn't it true that you closed it because you didn't want

16    plaintiff to reach out to grab the phone?

17          MS. KELLY:  Objection.  Argumentative.  Lacks

18    foundation.

19          THE COURT:  Overruled.

20    BY MR. KISOB:

21    Q.    Please answer.

22    A.    I mean, I doubt he could.  The phone was several feet

23    away.  It doesn't look like it in the video but.

24    Q.    Did the Sergeant ask you to close the cell, the tray slots

25    for the other inmates or just plaintiff's?

1    A.    No, I do not.  Just plaintiff's.

2    Q.    And when you closed the tray slot, you proceeded to

3    retrieve the bag and then hand it over to the plaintiff;

4    correct?

5    A.    Yes.

6    Q.    You re-opened his cell door; correct?

7    A.    Yes.

8    Q.    Where was plaintiff standing -- plaintiff was standing

9    right there at the door when you re-opened it to hand him over

10   his bag; correct?

11   A.    No.

12   Q.    Where was he?

13   A.    I had instructed him to sit on his bunk or take steps

14   back.  You never just open the door with an inmate standing

15   right in front of it, especially --

16   Q.    When did you instruct him to do that?

17   A.    Before opening it.

18   Q.    Okay.  And so when you opened the door, he was standing

19   far away from the door, basically?

20   A.    Few feet, yes.

21   Q.    When you handed him his bag, wasn't he standing right

22   there to collect the bag or you flung it at him?  Did you throw

23   it at him?

24   A.    I honestly don't remember if I threw it in his wheelchair,

25   handed it to him, not entirely sure.

1    Q.    Just a moment I'm going to play you a video that is in

2    evidence already.

3          This is Exhibit Number 6 and the person in green, this

4    gentleman that you see on the screen walking towards the

5    camera, is that person you said instructed you to close

6    plaintiff's tray slot?

7    A.    Yes, that's my Sergeant.

8    Q.    Okay.  At this point in the video, the tray slot is still

9    open; correct?

10   A.    Yes.

11   Q.    That's when you're walking him back to his cell; correct?

12   A.    Yes.

13   Q.    So at any point in this video, can you tell me exactly

14   when he did tell you to close the tray slot?  If I play it

15   back, would you be able to tell me?

16   A.    I can't see my mouth move from this position so I couldn't

17   tell you to be exact.

18   Q.    So that's you holding plaintiff's door; correct?

19   A.    Correct.

20   Q.    And you're closing it without using your foot; correct?

21   A.    Correct.

22   Q.    And you close the tray slot; correct?

23   A.    Correct.

24         (Video playing.)

25   BY MR. KISOB:

1    Q.    This is Mr. Gay's cell; right?

2    A.    Correct.

3    Q.    Okay.  When you opened the door, you used your hand -- you

4    basically just used the key to pull the door open; correct?

5    Let me play it back so you can see.  I just want you to

6    confirm.  You used a key; right?  You pulled the key towards

7    you and then the door opened?

8    A.    Yes.  The locking mechanism is spring loaded.  So you need

9    to hold it in the open position in order to pull the door open.

10   Q.    I just want to confirm that you didn't have to pull

11   somewhat -- pull the door?  You just used the key?  You held

12   onto the key and pulled the door towards you?

13   A.    Yes.  It locks in place.

14   Q.    No.  I'm asking that to pull it towards you, to open the

15   door, you literally just held onto the key? You didn't --

16   A.    Yes.  The key becomes a handle as you open the door all

17   the way.

18   Q.    The key becomes a handle?

19   A.    Yes.  Because the key is shaped like a T, so when you put

20   it in the locking mechanism that's spring loaded, you hold the

21   spring top open the teeth and then you can pull the door open.

22   Q.    With the key?

23   A.    Yes.

24   Q.    And this is Mr. Gay's cell door you opened; right?

25   A.    Yes.

1   Q.   And at this point you are not looking at Mr. Gay, like,

2   what are you watching?  You looking at the TV; correct?

3   A.   Yeah.  He asked me about something on TV.

4   Q.   At what point did he ask you?

5   A.   When he was getting ready to shower.

6   Q.   No.  You literally just opened his door.  Let me show you.

7   A.   He could yell at me through the tray slot.  He could have

8   talked to me when I opened the door.  We're always yelling at

9   each other.

10  Q.   You were yelling at each other?

11  A.   Because you kind of have to, like, shout in there cause it

12  echoes.

13  Q.   So you opened the door and oh, as soon as he sees you

14  approaching, he goes, look at the TV for me?

15  A.   I can't remember what it was on, but it was something that

16  they wanted me to question because I don't have, like, a TV at

17  home.  I don't like watch TV so they're always asking me about

18  my thoughts on the TV.

19          THE COURT:  Let me interrupt for a moment.  My

20  courtroom deputy informs me regarding that witness that you

21  mentioned, that the prison just informed him, my deputy, that

22  that witness is available now but only for ten minutes.

23          MR. KISOB:  I am happy to briefly question him for

24  five minutes and then if defendants want to Cross.

25          THE COURT:  All right.  Let's do it.  Can you step

1    down for a few minutes?

2              And you'll have to be very quick.  Is he available on

3    the video?

4              THE COURTROOM DEPUTY:  Yes, Your Honor, as soon as I

5    can bring it up.

6              THE COURT:  You'll have to get right to the point.

7              THE COURTROOM DEPUTY:  I'm sorry, Your Honor.

8              THE COURTROOM DEPUTY:  Hello.  This is Paul Cruz,

9    clerk to Judge Wilson.  Can you hear me?  You have to unmute

10   the phone by hitting star six.  Is the witness there?

11             FEMALE VOICE:  Are you ready for Gay?

12             THE COURTROOM DEPUTY:  Yes, please.  Hello?  Hello?

13   Is the witness available?

14             MALE VOICE:  Hi, this is SATF.  We are ready.

15             THE COURTROOM DEPUTY:  Okay.  Is the witness there,

16   is Lafonzo Turner?

17             MALE VOICE:  Yes, I have Mr. Gay here.

18             THE COURTROOM DEPUTY:  Okay.  Can you put him on line

19   please?

20        Do you solemnly swear that the testimony you are about to

21   give in the cause now before this Court shall be the truth, the

22   whole truth, and nothing but the truth so help you God?

23             THE WITNESS:  Yes.

24             THE COURTROOM DEPUTY:  Thank you, sir.

25                        DIRECT EXAMINATION

```
 1    BY MR. KISOB:
 2    Q.   Mr. Gay --
 3              THE COURT:  I don't see him on the screen.  No one
 4    sees him.
 5              MALE VOICE:  It's audio only.
 6              THE COURT:  What's your position on that?  Audio
 7    only?
 8              MS. KELLY:  Our understanding that it would be video
 9    and audio, Your Honor.
10              THE COURT:  So you object?
11              MS. KELLY:  We object.
12              THE COURT:  I'll sustain the objection.
13              MR. KISOB:  Can you turn on the video please?
14              THE WITNESS:  The camera on the screen is off.  I got
15    to up there at the top.  All you got to do is --
16              THE COURT:  I'm not seeing anyone on the screen.
17              MR. KISOB:  You have to turn it on, Your Honor.
18              THE DEFENDANT:  They have a line on the camera.  They
19    got to turn the camera on.
20              MALE VOICE:  They said audio only.
21              THE COURTROOM DEPUTY:  They said audio only and audio
22    only is not acceptable to the defendant, so let's get back to
23    the deputy.
24              MR. KISOB:  Your Honor --
25              THE COURT:  I've ruled.  Get back to the deputy.
```

```
 1    That's it.
 2              THE COURTROOM DEPUTY:  Thank you very much.  The
 3    Court will be ending the call now.
 4              THE WITNESS:  Are we done now?
 5              THE COURTROOM DEPUTY:  Yes.
 6              THE COURT:  Take the --
 7              MR. KISOB:  Your Honor, may I be heard?
 8              THE COURT:  Not right now.  Take the stand, Deputy.
 9              There is no video.
10              MR. KISOB:  They were turning it on.  They were going
11    to turn it on, Your Honor.
12              THE COURT:  They were not going to turn it on.  My
13    clerk spoke to them.
14              MR. KISOB:  They are misleading him.  They were going
15    to turn it on.  It shows on the screen that they can turn it
16    on.
17              THE COURT:  Mr. Cruz, did they tell you audio only?
18              THE COURTROOM DEPUTY:  Yes, Your Honor.
19              THE COURT:  You see.  Let's go.
20              MR. KISOB:  They did it the last time, Your Honor.
21              THE COURT:  Let's go.
22              MR. KISOB:  Your Honor, I need 30 seconds, Your
23    Honor.  I need 30 seconds.
24              Your Honor, please, one last time, Your Honor.
25              THE COURT:  Not last time.
```

```
1              MR. KISOB:  I'm begging you, Your Honor.
2              THE COURT:  Don't beg.  I've ruled.  If you're not --
3    don't ask a question, I'm going to terminate your examination.
4    You have to keep going with this witness.
5                    CROSS-EXAMINATION (CONTINUED)
6    BY MR. KISOB:
7    Q.    Mr. Ynigo.
8    A.    Yes, sir.
9    Q.    When you opened Mr. Gay's door, you turned around and you
10   were facing -- you were backing the cell door; correct?
11   A.    Yes.
12   Q.    Were you at that time aware that Mr. Gay is K 19?
13   A.    Yes.
14   Q.    And K 19 means that he's a very -- considered to be very
15   dangerous; correct?
16   A.    Yes.
17   Q.    And the highest level you can get K categories is K 20, so
18   he was one step away from the highest level of that; correct?
19   A.    Yes.
20   Q.    So is it fair to assume you weren't scared of Mr. Gay?
21   A.    At that moment, no.
22   Q.    When you say, at that moment, no, did that change on
23   September 19?  You said at that moment you weren't scared of
24   him.  Did that change on that day?  Did you suddenly become
25   scared of him?
```

```
1   A.   At him, no.
2   Q.   Did you say, at him or of him?
3   A.   At him.
4   Q.   I mean scared of him?
5   A.   Or of him, yes.
6   Q.   When did that -- when did you suddenly become scared of
7   him?
8   A.   No, I mean, correct.  I was not scared him that day.
9   Q.   And -- sorry.  I am just trying to connect the video.  I
10  am going to play back Exhibit Number 6.
11       Sorry, Your Honor.  I'm just trying to reconnect to the
12  court's system.
13           THE COURT:  All right.
14  BY MR. KISOB:
15  Q.   So I'm going to fast-forward this and let me just see.  So
16  you are looking at the TV, is that when you say he asked you to
17  look at something on the TV for him?
18  A.   He had questioned something about the TV.
19  Q.   You left his door open; correct?  And walked away.
20  A.   Yes, he believed my Sergeant was still there but I guess
21  not.
22  Q.   You believed your Sergeant was still there?
23  A.   Yeah.  I didn't hear him walk away when I walked away from
24  the door.
25  Q.   You didn't hear him walk?  Did you not see him walk away?
```

1    A.    I did not, no.  I was looking at the TV and then I make a

2    left and then my Sergeant exits.

3    Q.    At this point you would agree with me that you have 180

4    degrees eyesight; right?  You can see to the right and to the

5    left; correct?

6    A.    Yes.

7    Q.    Okay.  Why did you go back into that room?

8    A.    To prep the shower water.  I like to warm the water before

9    the inmate gets in the shower to make sure it's --

10   Q.    This is Mr. Gay; correct?

11   A.    Yes.  That's Mr. Gay.

12   Q.    Did you see him just close his cell door?

13   A.    Yes.

14   Q.    Did he use his foot?

15   A.    He did not.

16         MS. KELLY:  Objection, Your Honor.  The video speaks

17   for itself.  He's asking him to comment on what the video is

18   showing that's not him.

19         THE COURT:  He can ask the question.  Overruled.

20   BY MR. KISOB:

21   Q.    Okay.  Right here where -- so shortly before Mr. Gay gets

22   into the shower, you opened the door and you retrieve what

23   appears to be a bag; correct?

24   A.    Yes.

25   Q.    At this point the plaintiff's cell door is closed;

1  correct?  You had closed it?

2  A.   Yes.

3  Q.   And Mr. Gay is making his way into the shower; correct?

4  A.   Yes.

5  Q.   Was there any reason why you couldn't wait until Mr. Gay

6  was in the shower before you opened plaintiff's cell door to

7  hand him over his bag?

8  A.   I guess there wasn't, no.

9  Q.   If plaintiff's tray slot was open, would you have been

10 able to then to just send in that bag through the tray shot as

11 opposed to reopening the door?

12         MS. KELLY:  Objection.  Speculation.

13         THE COURT:  Overruled.

14 BY MR. KISOB:

15 Q.   Please answer.

16 A.   I did think about that but it's dirty laundry.  I didn't

17 want to put it through where the food goes through.  And my

18 Sergeant had already told me to close the tray slot.  I didn't

19 want him to see me on camera opening it.  So I thought, I'll

20 just tell him to back up to the back of his cell, pop the door

21 open, and toss it in his wheelchair that's always in the front

22 of his cell.

23 Q.   So you care about sending in dirty laundry through

24 plaintiff's tray slot; correct?

25 A.   Yeah.  I mean, that would piss me off if I were him, you

1  know.

2  Q.   So did that also mean that you cared about plaintiff on

3  that day?  You cared about his safety, his wellness and

4  everything?

5  A.   I care about getting home safely.

6  Q.   I'm asking in regard to you, you know, deciding not to

7  send in dirty laundry through the tray slot but deciding to

8  open the door to send it.  I'm asking that, would you say that

9  plaintiff is someone that you cared about on the day of the

10  incident?

11  A.   Yes.

12  Q.   Okay.  And when you then decided to reopen the open the

13  door, is it at this point that you came to realize that

14  plaintiff was already at the back of the cell, like you

15  testified?

16  A.   Yes.

17  Q.   Okay.  So is it still your testimony after watching this

18  clip of the video, did you see what happened?  I can play it

19  again so you can see.

20        (Video playing.)

21  BY MR. KISOB:

22  Q.   That's you with the bag?

23  A.   Yes.

24  Q.   So does that appear to you to have been an action of

25  actually throwing the bag as opposed to handing it over to

1   plaintiff?

2   A.    I don't recall exactly what I did but it does look like I

3   was handing it to him.

4   Q.    And if you were handing it to him, it is fair to say he

5   was standing right there to collect it; correct?

6   A.    Yes.

7         (Video playing.)

8   BY MR. KISOB:

9   Q.    Deputy Ynigo, why did you use your foot to kick the door

10  shut while the plaintiff was standing there?

11            MS. KELLY:  Objection.  Asked and answered.

12            THE COURT:  Overruled.

13  BY MR. KISOB:

14  Q.    Please answer.

15  A.    To make sure that it was secure.

16  Q.    And after you kicked the door shut, is it true that you

17  heard the plaintiff scream; correct?

18  A.    Yes, afterwards.

19  Q.    It is also true that you saw blood; correct?

20  A.    Afterwards, yes.

21  Q.    When you say afterwards, you mean right after you kicked

22  the door shut; correct?

23  A.    Yes.

24  Q.    And isn't it true that you turned around and told Mr. Gay

25  to go back to his cell?

```
1   A.    Yes.

2   Q.    And isn't it true that you referred to the plaintiff as a

3   mother fucker?

4   A.    I don't remember.

5   Q.    And Mr. Gay refused to go back to his cell; correct?

6   A.    Yes.

7   Q.    And then you proceeded to secure him in the shower area;

8   correct?

9   A.    Yes.

10  Q.    At this time, isn't it true that plaintiff was still

11  yelling out in pain or screaming?

12  A.    I don't know about in pain.  He was screaming something

13  else at me, but.

14  Q.    Okay.  Did you go back to find out what was happening?

15  Like, did you turn to look at his cell to see what was

16  happening?

17  A.    I did not, no.

18  Q.    You are the individual in the screen, right, walking away;

19  correct?

20  A.    Yes.

21  Q.    And when you left the scene, what did you do next?

22  A.    I went to go call paramedics.

23  Q.    Where are they located inside the jail?

24  A.    The paramedics aren't located inside the jail.  I went to

25  my control booth which is 12 feet away from that location and
```

Case 2:24-cv-01388-SVW-ADS    Document 162-2    Filed 11/06/24    Page 101 of 143
Page ID #:2921
100


1  to call paramedics to order my partners to go get help from
2  nursing staff and my Sergeant.
3  Q.    Okay.  Did you -- so when you called the -- when you
4  alerted some people about what had happened, what did you see
5  had happened?  Why were you calling the paramedics?
6  A.    Because I saw the blood, the bloody hand he had, he was
7  smacking it against his window and saying, I got you now,
8  mother fucker, he yelling at me --
9             MR. KISOB:  Move it strike, Your Honor.  The response
10 --
11            THE COURT:  Overruled.
12 BY MR. KISOB:
13 Q.    At this point, would you still say that you cared about
14 plaintiff's well being?
15 A.    Yes.
16 Q.    By walking away after seeing blood?
17 A.    Yes.  I'm not a medical professional.  There is nothing I
18 could have done in that situation.  I needed to get a medical
19 professional to help him.
20 Q.    You didn't see -- it is true that you saw the finger
21 hanging in the cell door; correct?
22 A.    I didn't see the finger at the time.  I was looking
23 through the window at him.
24 Q.    Just a moment.  I'll take you to what we have in evidence
25 as Exhibit Number 3 which is the video of the medical care

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

1    after accident, Bates number 00014.  Do you see the area I'm

2    circling around with the curser?  Can you see that?

3            MS. KELLY:  Counsel, we can't see that.

4            THE DEFENDANT:  I do not.

5    BY MR. KISOB:

6    Q.   Just on the right-hand side of the door, the doorframe,

7    just where you have the handle to the right of it, a little bit

8    to the right, do you see that -- okay.  There it is on the

9    right side of the door just by the handle?

10   A.   Yes.

11   Q.   Do you see something protruding out of the door?

12   A.   Yes.

13   Q.   Isn't that the tuft of plaintiff's finger?

14           MS. KELLY:  Objection.  Lacks foundation.  Relevance.

15   This is after the fact after he's not there.

16           THE COURT:  He can ask him whether he saw what's in

17   the picture.

18   BY MR. KISOB:

19   Q.   Did you not see what you now see in this picture after you

20   slammed the door on plaintiff's -- when you kicked the door

21   shut?

22   A.   No.  It was after the fact when my partner told me that

23   the finger was stuck in the door.  I had tunnel vision because

24   of the rapidly evolving situation.

25   Q.   After you closed or kicked plaintiff's door shut, to your

1  knowledge, did anyone go back in there and re-open the door?

2  A.    After I left, I have no idea what happened.

3  Q.    Did someone else have the key to the cell door?

4  A.    Yes.  All the staff.

5              MS. KELLY:  Objection.  Calls for speculation.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.  All the staff have the key for

8  that.

9  BY MR. KISOB:

10  Q.    So would you -- so are you saying that after you closed

11  the cell door, someone re-opened it and then plaintiff put his

12  finger there?

13             MS. KELLY:  Objection.  Argumentative.

14             THE COURT:  Overruled.

15  BY MR. KISOB:

16  Q.    Please answer.

17  A.    No, I am not.

18  Q.    So you agree that this fingertip could only have been

19  there after you kicked the door shut; correct?

20  A.    Yes.

21  Q.    Did you ever make a statement to the effect that this is

22  not the worst thing you've done in the county?

23  A.    No, I did not.

24             MR. KISOB:  Your Honor, that will be all for this

25  witness for now.

```
1         THE COURT:  Any Redirect?  I mean, not Redirect.
2    That was Cross-examination.  This is Direct.
3         MS. KELLY:  Yes, Your Honor.
4                        DIRECT EXAMINATION
5    BY MS. KELLY:
6    Q.   Good afternoon, Deputy Ynigo.
7    A.   Good afternoon, ma'am.
8    Q.   So this incident once again, the date was September 19,
9    2023?
10   A.   Correct.
11   Q.   And the 7000 row which is where this cell was, how long
12   were you assigned there as that being your regular assignment?
13   A.   A few months.
14   Q.   What is a few months?
15   A.   Five, six months.
16   Q.   Okay.  And for the duration of that five, six months that
17   you were there, was plaintiff in the same cell 7032 when you
18   were assigned at that row?
19   A.   He came after I was assigned there but he was in the same
20   cell the entire time of his stint.
21   Q.   Okay.  And that is a cell that is the closest cell to the
22   shower, right across the hallway?
23   A.   It's directly adjacent to the shower, yes.
24   Q.   Okay.  And would you -- how many feet would you say that
25   is?
```

1    A.    Four feet.

2    Q.    Okay.  And when you worked at the 7000 row, what about

3    inmate Gay, do you recall him being housed in the cell that he

4    was in that we saw in the video during the duration that you

5    were working on that row?

6    A.    Yes, he was.

7    Q.    Counsel was asking you about several policies that were

8    admitted into evidence and I want to direct your attention to

9    the one that was marked as Exhibit 9, Unit Order 3-01001 for

10   point of reference, that talks about all doors, et cetera,

11   sliders and gates, shall be closed and secured at all times.

12   Does closed and secured mean the same thing or different thing?

13   A.    They're different.

14   Q.    How so?

15   A.    Something can be closed but not secured, you know, you can

16   close the door -- your front door of your house but you don't,

17   like, lock it with a deadbolt and other lock, you know.

18   Q.    So in the environment of the jail, is a closed unlocked

19   door considered secure or not secure?

20   A.    That would be not secure.

21   Q.    Okay.  And when you had Mr. Jones back in his cell after

22   taking him from the shower and your Sergeant being present, and

23   the door closed, was that door closed and secured at that time?

24   A.    Yes.

25   Q.    And then at the point where we saw in the video that you

1    had walked over to Mr. Gay's cell?  Do you remember that?

2    A.    Yes.

3    Q.    And Sergeant Aramela was still on deck with you?

4    A.    Yes.

5    Q.    So there were two of you there?

6    A.    Yes.

7    Q.    And that was when you opened Mr. Gay's door?

8    A.    Yes.

9    Q.    How many doors away is he from Mr. Jones's door?

10   A.    Three or four.

11   Q.    Okay.  And in terms of feet from Mr. Gay's door to the

12   shower, how many feet is that?

13   A.    Seven to ten.

14   Q.    Okay.  So when you were talking about the inmate, Mr. Gay,

15   asking you about something on TV, was that the portion of the

16   video where you were facing the wall with appearing to have

17   your back to Mr. Gay's door?

18   A.    Yes.

19   Q.    Where is the TV mounted in relation to his door?

20   A.    A little like two feet to the right of his cell.

21   Q.    Okay.  So you were looking at the TV?

22   A.    Yes.

23   Q.    Why did you turn your back on the door to Mr. Gay's cell

24   after you opened it?

25   A.    When I opened the door I had seen him naked on his bed,

1  preparing himself for the shower, and my Sergeant was right

2  next to me.  I felt completely safe.

3  Q.   Okay.  So would it be fair to say at that time that in

4  your training that security operations were still under control

5  given that you had a Sergeant with you and that there were two

6  of you at that time?

7  A.   Yes.

8  Q.   So as he proceeded to get ready for the shower and walked

9  to the -- strike that.

10      You walked over to the door next to the shower to turn on

11  the water.  Do you remember that testimony?

12  A.   Yes.

13  Q.   Okay.  And at that point would the next thing that happens

14  is the inmate goes in and the shower is on and -- are they

15  given anything else typically that they might ask for?

16  A.   Yeah.  They ask for soap or an indigent kit which consist

17  of, like, a razor, shampoo, shaving supplies.

18  Q.   Okay.  But sometimes people -- inmates bring their own in

19  like Mr. Jones might from time to time; right?

20  A.   Yes, it can be bought on the store.

21  Q.   Okay.  So when you were you in the process of carrying out

22  of programming of the shower for Mr. Gay, it was at that point

23  that either you or he realized that someone else's property was

24  still in the shower; correct?

25  A.   Yes.

```
1   Q.   And do you remember one way or the other if it was you
2   that noticed it or --
3           THE COURT REPORTER:  Slow down.
4   Q.   I'm sorry.
5           Can you remember if it was you or Mr. Gay or even
6   Mr. Jones identifying that there was left property in the
7   shower?
8   A.   It was Mr. Gay that told me.
9   Q.   Okay.  So would it have been within policy for you to have
10  him continue enter the shower before you exited, took the bag
11  out to return it to its owner?
12  A.   Yes.
13  Q.   Okay.  So was that the motivation for you to return the
14  bag to Mr. Jones before completing the shower programming with
15  Mr. Gay.
16  A.   Yes.
17  Q.   And so at the time that you did that, you literally had to
18  just pivot your body to Mr. Jones's cell which was directly
19  across from the shower?
20  A.   Correct.
21  Q.   And but at that point the shower door to Mr. Gay's
22  programming was still open, wasn't it?
23  A.   Yes.
24  Q.   Okay.  So when you opened the door to return the shower
25  bag, you had stated that you don't remember whether you threw
```

1    it on the chair and then we looked at the video.  And then do

2    remember handing it to him while he was standing at the front

3    door?

4    A.    I don't remember exactly but from the video, it looks like

5    I handed it to him.

6    Q.    Okay.  And so -- but do you remember whether you had

7    ordered him to step away from the front door of his cell before

8    you opened it?

9    A.    Yes.  That's common practice.

10   Q.    And did you do that on day?

11   A.    Yes, I did.

12   Q.    So when you opened the door and if you handed it to him as

13   it was shown on the video, was he in compliance with your order

14   or not?

15   A.    When I handed it to him?

16   Q.    Was he right there or stepped a few feet back?

17   A.    It was a few feet back leaning forward.

18   Q.    And at this point did you have an awareness of where

19   Mr. Gay was in the sequence of his programming for the shower?

20   A.    I did not.  I was focused on the open door in front of me,

21   and he was trying to ask me a question.

22   Q.    All right.  And the -- I'm going to use the word

23   temperature, if you can follow me on that.  Can you describe

24   the temperature of the conversation that you were having with

25   Mr. Jones when you opened the door to return the shower bag?

1  A.  He was mildly upset about not being able to get back on
2  his phone program or whatever conversation we were having at
3  the time, and the temperature had been rising a little bit, so
4  I just had to get the door shut and make sure we had proper
5  security.
6  Q.  So your concern at that moment was what?
7  A.  The security of the row.
8  Q.  But in terms of the immediate area between the shower
9  directly across from Mr. Jones' cell, what was the security
10  concern going on in your mind as you returning the bag?
11  A.  That I had Mr. Jones in front of me becoming visibly upset
12  and I had Mr. Gay behind me.  I didn't know what he was doing.
13  Q.  At any point had you asked Mr. Gay to return to his cell
14  so that you could start over and complete the return process of
15  the bag with Mr. Jones?
16  A.  I did not, no.
17  Q.  Okay.  So you had -- what was in your mind in terms of
18  returning the bag and completing the showering program with
19  Mr. Gay?  How was that order going to play out in your mind?
20  A.  Well, I thought he was going to wait right there while I
21  -- Mr. Gay did not want to enter the shower with Mr. Jones'
22  property in it and then I didn't want him to do that also in
23  case there had been contraband or something in there they were
24  trying to pass to each other.  So my intention was for Mr. Gay
25  to wait by the shower but as I started fumbling with my keys

1    and trying to open his door and waiting for him to step back,

2    Mr. Gay just proceeded to get into the shower.

3    Q.    So that was after you had asked him to return to his cell

4    and he refused?

5    A.    Yes.

6    Q.    But the water was already on or?

7    A.    I had turned the water off but I had previously turned it

8    on for a little bit just to make sure it was warm.

9    Q.    But when Mr. Gay went into the shower regardless of you

10   asking him to go back, you would have to had to turn the water

11   back on?

12   A.    Yes.

13   Q.    Okay.  And so when you returned the shower bag and

14   Mr. Jones was asking you about the issue of the phone use, did

15   you have any other bodies that were assigned to that row to

16   simultaneously run the telephone monitoring while the showering

17   was being completed?

18   A.    No.  I was supposed to have two other deputies with me but

19   one was dispatched to a detail so I only had one.

20   Q.    Okay.  And what kind of equipment, if any, do you have on

21   your person when you are on the row walking that row?

22   A.    Supposed to have my radio but I did not.

23   Q.    Why didn't you have your radio that day?

24   A.    After I had put Mr. Jones in the shower for the first

25   time, that's, like, the last scan for the Title 15 scans, I go

1    back to the booth in between showers and I do all my computer

2    work.  So I generally take my radio out and put it into the

3    charging stand and work on all my passes for the day, there's

4    several, and I was interrupted by my Sergeant.

5    Q.    Okay.  So can you -- how many cells are there on the 7000

6    row where Mr. Gay and Mr. Jones were living that day?

7    A.    Seven or eight.

8    Q.    And how long is that corridor to the Sally port which is

9    the end of the corridor from the shower to when the row ends?

10   A.    The entire corridor?  Probably 30 feet.

11   Q.    And so the sign that you were asked about earlier

12   pertaining to handcuffing, where was that in relation to the

13   end of the corridor that you just described?

14   A.    Several feet away.

15   Q.    Okay.  And the office that you had mentioned you called

16   paramedics from, where was that in relation to the end of the

17   corridor?

18   A.    Another several feet, just right around that little

19   corner.

20   Q.    Can you describe the layout of the 7000 floor as it

21   relates to any medical personnel as opposed to sheriff

22   personnel that are also present on that floor for the inmates

23   if they need it?

24   A.    Well, the entire 7000 floor is a horseshoe pattern and

25   what cuts in the middle of that horseshoe is the hard row which

1  can be accessed from either side and there are several little

2  medical offices around the horseshoe.

3  Q.   Is the hard row, the row that Mr. Jones and Mr. Gay were

4  living on?

5  A.   Yes.

6  Q.   Okay.  After you opened the door to return his shower bag,

7  do you recall where his hands were after you handed the bag to

8  him?

9  A.   I do not.

10  Q.   Do you recall whether either or both of his hands were

11  anywhere near the doorframe to his cell?

12  A.   I do not know.

13          MR. KISOB:  Your Honor, it would appear that the same

14  deputy who reported my client's wife about using the phone is

15  using the phone as well.  I have observed him constantly

16  holding his phone.

17          THE COURT:  I can't hear you.  We are trying to get

18  through this witness.  You are interrupting this examination.

19  Proceed.

20          MS. KELLY:  Thank you.

21  Q.   Let's talk about the handcuffing protocol, Deputy.  When

22  you as a 7000 row assigned deputy have inmates to monitor and a

23  jail to run, is it common that you have inmates that are there

24  that you consider a regular that you are familiar with on

25  day-to-day basis?

```
1    A.    Yes.
2    Q.    Was Mr. Jones one of those people during the time that you
3    were assigned to the 7000 row?
4    A.    Yes.
5    Q.    And what about Mr. Gay?
6    A.    Him as well, yes.
7    Q.    Okay.  We had talked earlier about inmate classifications
8    K 19, if you remember that term.  Now, you said that that was a
9    high risk designation?
10   A.    Yes.
11   Q.    So in terms of your training, aside from the fact that you
12   have inmates that you are familiar with on the row, how does
13   the high risk designation affect your decisions in your efforts
14   to maintain security when you have a situation like what
15   happened where you have a door opening to Mr. Jones' cell and a
16   K 19 inmate with an open door entering the shower right behind
17   you?
18   A.    You have to be more cautious.
19   Q.    Why is that?
20   A.    More aware.  Because of their classification designation.
21   Q.    What is different if you can explain to us why that
22   classification is different in terms of what to be vigilant
23   about as opposed to anyone else that's not that designation?
24   A.    K 19 is hostile or dangerous or assaultive towards staff
25   or other inmates.
```

1   Q.    Does that include unpredictable, maybe?

2   A.    Yes, it does.

3   Q.    So at the time that you returned the bag and you're

4   thinking through the security issue that was presented, I just

5   want to be sure, did you have your radio on that time or not?

6   A.    I did not.

7   Q.    On your person, I mean?

8   A.    It wasn't on my person.

9   Q.    Okay.  And so after you closed the door heard and you

10  heard Mr. Jones screaming, why didn't you open the door?

11  A.    Because there was no help that I could provide for him and

12  I would have to -- if I open the door, I don't know to fight

13  me.  It just wouldn't be a smart move.

14  Q.    So your next thought in walking away as we saw in the

15  video was the location where you went and that was where?

16  A.    To my control booth to get help.

17  Q.    Okay.  And had you had your radio on you, would that have

18  made a difference in terms of quickness or not to call from

19  where you stood as opposed to walking away?

20  A.    Yeah.  It would have prolonged things if I had my radio

21  on.

22  Q.    Why is that?

23  A.    Because if I just walk outside the corridor, I can yell to

24  my partners, but if I get on the radio, ask to transfer to a

25  different part of the facility where other people will respond.

1  Q.   When you walked away to the end of corridor to the 7000 to
2  area where you notified people to come help, how far away were
3  those people?
4  A.   Twenty feet.
5  Q.   And the nurse that was seen on the video, is she in the
6  same location or a different location from your partners that
7  responded with her?
8  A.   That was a different location.
9  Q.   Okay.  And as you left the tier to summon assistance, you
10 didn't stop and do anything else or talk to anyone else such as
11 Mr. Turner or anyone else on the row, did you?
12 A.   No.
13 Q.   Do you still work for Men's Central Jail?
14 A.   Yes, I do.
15 Q.   But you don't work for the 7000 row; right?
16 A.   No.
17 Q.   You don't work in a different location at the same
18 building of the jail?
19 A.   Yes.  I work for the mental health and the LGBTQ
20 community.
21 Q.   Did you get in trouble for what happened here for this
22 accident?
23 A.   Yes, I did.
24 Q.   And what were you written up for?
25 A.   For not having my radio.

1    Q.    And why was it important to have your radio?

2    A.    It's in our policy to put out call for help no matter if

3    you don't immediately need it or, you know, just in a rapidly

4    evolving situation happens, just like that.

5    Q.    But in this rapidly evolving situation, when you walked

6    away to get help that was, what did you say, 30 feet away?

7    A.    Yes.

8    Q.    And that was quicker than had you radioed, if you had your

9    radio?

10   A.    Yes.

11   Q.    And with respect to the handcuffing with the inmates that

12   you were familiar with such as Mr. Jones and Mr. Gay, were

13   there times because of your regularly assigned position to this

14   row that you would not follow the letter of the regulation to

15   handcuff someone to walk four feet?

16   A.    Yes.

17   Q.    Across the hallway to their shower?

18   A.    Yes.  We have watch commander approval.  Sometimes when we

19   get a new inmate and we notice they have a medical condition

20   that hinders them from being handcuffed to the rear, or we're

21   trying to get to know them better, then yes, we wont handcuff,

22   especially if it's not a movement.  When it's just like a

23   little two to four feet to a shower exchange or something and

24   they're on a secure row, then it's justifiable.

25   Q.    You said movement, what do you mean by movement?

1    A.    Like if you were to leave that hard row, that would be

2    considered a movement.

3    Q.    Leave the hard row to go where?

4    A.    A visiting pass or a turning room pass.

5    Q.    All right.  And when you say handcuffed to the rear, what

6    do you mean by that?  What is handcuffing to the rear?

7    A.    I would have to have him turn around, lift his arms to the

8    upper back level, and then stick his arms through the tray slot

9    and then handcuff.  It's really uncomfortable especially for a

10   lot of people with medical conditions, so sometimes we don't.

11   Q.    So for you having known Mr. Jones and Mr. Gay both of whom

12   we saw ambulate with assistive walking devices, would following

13   the letter of the handcuffing rule that was posted be caring of

14   them, if you were going to move them from the cell to the

15   shower a few feet?

16   A.    Yes.

17   Q.    So okay, but you would -- would you handcuff them from the

18   rear given that they have to walk using a walker or a cane?

19   A.    No.

20   Q.    Okay.  But with respect to people and maybe yourself if

21   you're working in another row to substitute for someone else if

22   you're not familiar with the inmate population there, is it

23   typically more likely that you would follow the letter of the

24   rule when you're in an unfamiliar security environment?

25   A.    Yes.

```
1            MS. KELLY:  I have nothing else.

2            THE COURT:  Recross.

3                         RECROSS-EXAMINATION

4   BY MR. KISOB:

5   Q.    Deputy Ynigo.

6   A.    Yes, sir.

7   Q.    You testified that it was customary to advise the inmate

8   to step back each time you opened their cell doors; correct?

9   A.    Yes.

10  Q.    You also testified that, when you reopened plaintiff's

11  cell door to hand him over his shower bag, you did not see him

12  standing at the front of the door.  He was somewhere in the

13  back; correct?

14  A.    Yes.

15  Q.    Is it your testimony then that you were telling someone in

16  the back of the cell to stand back, to stay away?

17  A.    No.  He was in the doorway and I could see his face

18  through the window when he asked but I had told him to step

19  back so I may open the door.

20  Q.    When you said the doorway, what do you mean?  Was he in

21  the back of the cell or was it standing right in the front of

22  the cell?

23  A.    During which conversation?

24  Q.    When you reopened the door to hand over his shower bag?

25  A.    He was a few feet back.
```

1  Q.   So someone who was a few feet back, you would still tell
2  them stand away?
3  A.   Yes.
4  Q.   If I replay the video, will you be able to show me exactly
5  at what point you told him to stand back?
6  A.   No, not exactly.  I cant really, like, see my lips move or
7  anything on there.  This not really good quality.
8  Q.   And the alleged policy of asking the inmates to stand
9  back, is that something that you created or is that something
10  you were told to do?
11  A.   It's part of our training.
12  Q.   Is it not also part of your training that you have to cuff
13  the inmates each time you take them out of their cell?
14  A.   Yes.
15  Q.   Did you do that on the day of the incident?
16  A.   No, I did not.
17  Q.   You were testifying about the fact that it's possible to,
18  you know, not follow the rules sometimes.  Is that part of your
19  training?
20  A.   No, it is not.
21  Q.   When you said that sometimes it is okay to take the inmate
22  out of their cell without cuffing them, is that part of your
23  training?
24  A.   No, it is not.
25  Q.   So the only part of your training you decided to use on

1    that day was to tell the plaintiff's to stand back?

2    A.    I suppose so, yes.

3    Q.    When you told him to stand back, what did he say?

4    A.    I don't remember, that was over a year ago.

5    Q.    To your understanding, did he hear you say you should

6    stand back?

7              (The court reporter interrupted.)

8              MS. KELLY:  Objection.  Calls for speculation.

9              THE COURT:  Well, I mean, you can ask him whether

10   when he was told to stand back whether the plaintiff

11   acknowledged it verbally or by gesture.

12   BY MR. KISOB:

13   Q.    Did the plaintiff do anything that made you understand

14   whether or not he had understood your order that he should

15   stand back?

16   A.    Yes, I am sure he took a step back.  I wouldn't feel

17   opening the door otherwise.

18   Q.    Okay.  So he complied with your order essentially?

19   A.    Yes.

20   Q.    And you when you reopened the door, you handed over his

21   shower bag to him; correct?

22   A.    Yes.

23   Q.    And when you shut the door, it is true that you did not

24   tell him to stand back; correct?

25   A.    No, I did not.

```
1   Q.   Okay.  Please turn to Exhibit Number 10 that is in
2   evidence.
3            MS. KELLY:  Exhibit 9, Counsel.  Exhibit 9, Counsel.
4   BY MR. KISOB:
5   Q.   All right.  Turn to Exhibit 9 in the new exhibit list.
6   Thank you.  Can you please turn to the second page of that
7   exhibit?
8   A.   Yes.
9   Q.   It says -- doesn't it say, "At no time will more than one
10  inmate be allowed onto the same row corridor"?
11  A.   Yes.
12  Q.   Doesn't it say, "At no time shall deputy personnel permit
13  inmate to approach the cell of another inmate on the row to
14  accept any items or engage in conversation"?
15  A.   Yes.
16  Q.   And doesn't it also say, "All modular gates and doors
17  shall remain it the locked position at all times with the
18  exception of authorized use"?
19  A.   Yes.
20  Q.   Please next page which is page three at the bottom, do you
21  see where it says, "Handcuffs/waist chains shall be used when
22  escorting"?
23  A.   Yes.
24  Q.   And page five in Exhibit 9, page five, do see at the
25  bottom where it says, "Showers"?
```

1  A.   Yes.

2  Q.   And do you see where it says, "Escort personnel shall

3  handcuff, maintain and escort inmate to the shower in boxer

4  shorts with a towel."  Do you see that?

5  A.   Yes.

6  Q.   You didn't comply with any of this things on that day;

7  correct?

8  A.   No, I did not.

9  Q.   You testified moments ago that the security situation at

10  the jail can change at any moment; correct?

11  A.   Yes.

12  Q.   So you do know that Mr. Gay on September 19, 2003, made

13  the use of a walker?

14  A.   Correct.

15  Q.   For mobility; correct?

16  A.   Correct.

17  Q.   And you are also aware that the plaintiff on that day used

18  a cane and a wheelchair; correct?

19  A.   Correct.

20  Q.   And on that day you knew that the inmates housed at the

21  7000 floor are people who need some sort of medical care;

22  correct?

23  A.   Correct.

24  Q.   Now, when you talk about the inmates being hostile and

25  unpredictable, in relation to Mr. Gay, for example, when you

1    opened the cell door to let him out to go take a shower, did

2    you believe that Mr. Gay had the propensity for violence?

3    A.    The propensity?  Like, physically capable of?

4    Q.    Yes.

5    A.    Or wanted to at that moment?

6    Q.    Was he capable of?

7    A.    I'd say he is.

8    Q.    And at that time, you believed that Mr. Gay was

9    unpredictable; correct?

10   A.    Yes.

11   Q.    Knowing this you decided to open his cell door and turn

12   around and face the wall; correct?

13   A.    Correct.

14   Q.    And that is part of your knowledge of his

15   unpredictability, you left his cell door open and walked away

16   towards the shower area; correct?

17   A.    Correct.

18   Q.    And with your knowledge of this same unpredictability, you

19   reopened the plaintiff's cell door while Mr. Gay was standing

20   there and trying to make his way into the shower; correct?

21   A.    Correct.

22   Q.    You testified that you do not recall using the word

23   "mother fucker" when you spoke to Mr. Gay shortly after

24   shutting the cell door.  There is a video that I am going to

25   play and it is a recording that was made shortly after the

```
1   incident by Mr. Gay.
2           MS. KELLY:  Objection, Your Honor.  The defense
3   objects to the video.  Calls for speculation.
4           THE COURT:  I am understanding Mr. Gay is going to
5   testify; correct?  Is it something Mr. Gay won't testify to?
6           MR. KISOB:  He tried to testify --
7           THE COURT:  Mr. Gay, is he going to testify at this
8   trial?
9           MS. KELLY:  Yes, Your Honor.
10          THE COURT:  Is he going to testify about what he
11  recorded?
12          MR. KISOB:  Yes, Your Honor.
13          THE COURT:  And is the recording in a format that the
14  jury can hear?
15          MR. KISOB:  Yes, it's a video.
16          THE COURT:  Is he going -- are you going to present
17  it when Mr. Gay testifies?
18          MR. KISOB:  The video?  I don't need to do it when he
19  testifies, Your Honor.  I'll just have him testify.
20          THE COURT:  But in the course of his testimony, is he
21  going to play the recording?
22          MR. KISOB:  I probably would.
23          THE COURT:  Well, then I'll sustain the objection.
24          MR. KISOB:  Okay, Your Honor.
25  Q.   Deputy Ynigo, you -- do you know -- isn't it correct that
```

```
1   it took about seven minutes between the time when you first

2   shut the plaintiff's cell door and when he was first seen for

3   his injuries?

4              MS. KELLY:  Objection.  Calls for speculation.  Lacks

5   foundation.

6              THE COURT:  Overruled.

7   BY MR. KISOB:

8   Q.   Please answer.

9   A.   After I left the incident, I have no idea how long what

10  took.   I went to go handle medical personnel and getting

11  people there, so I don't know.  Aside from the video footage,

12  like, I wasn't keeping track of time.  I was just kind of

13  trying to get everything going.

14  Q.   What was the first person I you spoke to when you walked

15  away from the floor?

16  A.   Both my partners.

17  Q.   What are their names?

18             MS. KELLY:  Relevance.

19             THE COURT:  Overruled.

20  BY MR. KISOB:

21  Q.   Please answer.

22  A.   It was Cruz who you saw in the video and I can't remember

23  the second person I had working with me that day.

24  Q.   Is Cruz part of the medical personnel?

25  A.   No.
```

1  Q.   Is the other person part of the medical personnel?

2  A.   No.

3  Q.   So who was the first medical member of the medical team

4  that you spoke to?

5  A.   Whoever picked up the phone.

6  Q.   Was it a man or a woman?

7  A.   It was a female.

8  Q.   Could you tell?

9  A.   It was a female, yes.  I walked in the booth and I

10 instructed both my partners, one to go get medical personnel

11 physically, like, grab them and take them to the cell and the

12 other to go secure Jones.

13 Q.   Why didn't you go to grab medical personnel yourself?

14 A.   Because the altercation that happened was an accident and

15 I had no idea what happened, whose fault it was at that point

16 in time, so I needed to remove myself from the scenario.

17 Q.   An altercation is an accident?  Is that your testimony?

18 A.   Yes, accidents happen, yes.

19 Q.   So you do know that there was an injury that something

20 happened?

21       MS. KELLY:  Asked and answered.

22       THE COURT:  Overruled.  Overruled.

23 BY MR. KISOB:

24 Q.   Please answer.

25 A.   Yes, I put two and two together.  The door closed.  I saw

```
1   his bloody hand.  And he was yelling at me.
2   Q.   And after you called the medical personnel and had them go
3   and did you physically -- did you see people physically going
4   to take care of plaintiff?
5   A.   I physically did not, no.
6   Q.   Did you go back to check and see what was happening?
7   A.   No.  My Sergeant ordered me not to.
8   Q.   Who is your Sergeant?
9   A.   Sergeant Aramela.
10  Q.   And what did you do after -- what did you for the rest of
11  the day, starting from there, just in the next two hours what
12  did you do at the jail?
13          MS. KELLY:  Objection.  Relevance.
14          THE COURT:  Overruled.
15          THE WITNESS:  I handled the medical paperwork that
16  ensues after an inmate is injured in the facility.
17  BY MR. KISOB:
18  Q.   Okay.  And that would include the injury report; correct?
19  A.   Correct.
20  Q.   So this is in evidence Exhibit Number 1, you have
21  testified that you did not know for sure what had happened, but
22  this is an inmate injury report and I presume that this is one
23  of the reports you said you were working on right after the
24  incident; right?
25  A.   Yes.
```

```
1   Q.   Please look at part of the report that says "narrative."
2   I am not going to read the whole thing.  On the third line, do
3   you see something to the effect, being shot by deputy personnel
4   and as a result an inch of his finger was removed from his
5   right hand, right hand middle finger.  Do you see that?
6   A.   Yes.
7   Q.   And at the bottom, we have your signature, Ynigo; correct?
8   A.   Yes.
9        MR. KISOB:  Your Honor, that will be all for this
10  witness.
11       THE COURT:  Any further questions?
12       MS. KELLY:  No, Your Honor.
13       THE COURT:  Thank you, Deputy.  You can step down.
14       THE WITNESS:  Thank you, Your Honor.
15       THE COURT:  Call your next witness.
16       MR. KISOB:  Your Honor, I have been informed that
17  Mr. Gay is available to testify.
18       THE COURT:  Call Mr. Gay right now.
19     (A discussion was held off the record.)
20       THE COURT:  He's testifying live, is that it?
21       MR. KISOB:  Mr. Gay.
22       THE COURT:  Or is he testifying video?
23       MR. KISOB:  Video, Your Honor.
24       THE COURTROOM DEPUTY:  Okay.
25       THE PLAINTIFF:  They still got the camera off.
```

```
 1              MR. KISOB:  Hello, can you hear me?
 2              MALE VOICE:  Good afternoon.  This is SATF State
 3    Prison.
 4              THE COURTROOM DEPUTY:  Good afternoon.  The witness
 5    will please state his name.
 6              THE WITNESS:  Jennegh Earl Gay, J-E-N-N-E-G-H,
 7    E-A-R-L, G-A-Y.
 8              THE COURTROOM DEPUTY:  I'm going to swear you in now.
 9    Please raise your right hand.
10        Do you solemnly swear that the testimony you are about to
11    give in the cause now before this Court shall be the truth,
12    the whole truth and nothing but the truth, so help you God?
13              THE DEFENDANT:  Yes, I do.
14              THE COURTROOM DEPUTY:  Thank you.
15                        DIRECT EXAMINATION
16    BY MR. KISOB:
17    Q.   Good afternoon, Mr. Gay.
18    A.   Good afternoon.
19    Q.   Do you remember an incident that happened at the Men's
20    Central Jail in Los Angeles on September 19, 2023, between
21    Mr. Larry Jones and Deputy Ynigo?
22    A.   Yes.
23    Q.   Did you see the incident happen?
24    A.   Yes.
25    Q.   What did you see?
```

A.    I was on my way to the shower and prior to me going down
to the shower, I overheard Mr. Jones and Deputy Ynigo arguing.
I didn't pay much attention to the argument until Deputy Ynigo
slammed his -- Jones' tray slot closed.  That's a way in which
to silence somebody and if you don't want to hear them, just
close the tray slot.  We can't use the phone or see the TV.

        So he slammed his tray slot closed, came and cuffed
me and took me down there.  Just as I was about to get into the
shower, Mr. Jones' wet laundry and stuff was still in the
shower.  I heard Jones yelling, hey, my shower stuff is still
in there.  And Ynigo reached in and got the shower stuff, and
instead of opening the tray slot, which he had just slammed on
him, he opened the door which he wasn't supposed to do because
you're only supposed to open the door if somebody has handcuffs
on.

        He opened the door and threw it in real quick and
slammed the door closed.  And I was getting in the shower when
I heard Jones scream, you slammed my hand in the door.  My hand
is in the door.  Open the door.  And rather than Ynigo opening
the door so he could get his hand out, he left.  He left the
tier.  He hadn't taken the handcuffs off me or started the
water.  They have to start the water independently or control
it.  So he didn't start the water and he left the tier.  So I'm
yelling for him to come back and turn on the water.  Jones is
yelling because his hand is in the door and then he comes back

1  with the nurses and Sergeant about two or three minutes later
2  and opens the door.

3          And when he opened that door, there was blood
4  everywhere.  And the tip of Mr. Jones' finger was still stuck
5  in the door and fell out on the floor.  I mean, I didn't
6  believe, you know, what I was seeing because there was blood
7  everywhere.  So it was a surreal scene, you know.

8  Q.    Okay.  Right after he slammed the door on Mr. Jones'
9  finger, did you have any conversation with Deputy Ynigo?

10 A.    No.  He left.  I was yelling for him to start the water
11 because he had to go in the closet and start the water, turn
12 the water on, but at the same time, Jones is yelling which you
13 can't hear him.  You have to understand how that cube is
14 designed.  There's only seven cells and they call it a hard row
15 for a reason.  They can put you in the cell and close the door
16 and tray slot and you can barely hear somebody yelling because
17 it's a hard cell.  And so I can hear and Ynigo could hear if
18 you were near it, but then he left.  And I'm hearing Jones
19 yelling his finger -- he said his hand.  He said, my hand is in
20 the door.  My hand is in the door.  And I was thinking well, if
21 it was hand in the door, I would be screaming.  And he was
22 yelling but he wasn't screaming, you know, screaming,
23 screaming.  I would have been screaming --

24          MS. KELLY:  Objection, Your Honor.

25          THE WITNESS:  Was screaming.  I mean, his hand was

1  stuck in the door.

2          THE COURT:  He's been testifying in this narrative

3  form for the last three minutes.  You didn't make an objection.

4          MS. KELLY:  Well, he's already covered what was

5  covered in the prior testimony.

6          THE COURT:  All right.  Then ask a question.

7  BY MR. KISOB:

8  Q.   Did Deputy Ynigo at any time ask you to return to your

9  cell?

10  A.   Yes, yes.  When he first slammed the door on his hand, he

11  was telling me go back to your cell.

12  Q.   Did he tell you why was asking you to go back to your

13  cell?

14  A.   Yeah.  Because he slammed his hand in the door.  Ynigo

15  knew he slammed his hand in the door.

16          MS. KELLY:  Objection.  Argumentative.

17          THE COURT:  Mr. Gay, this is Judge Wilson.  I want

18  you to listen to the question and only answer the question and

19  Mr. Kisob will ask you further questions to elicit more

20  information, but answer the question as it's asked and wait for

21  another question.

22          THE WITNESS:  He asked me --

23          THE COURT:  All right.  Hold off.  We're starting

24  from this point.  Go ahead.

25  BY MR. KISOB:

1  Q.   What did you do when he asked you to go back to your cell?

2  A.   I said, no, I'm already here and I got in the shower.

3  Q.   And during that conversation, did he mention plaintiff's

4  name?

5  A.   No.  He just locked the door and left.

6  Q.   And is there a door leading into the section where you and

7  the plaintiffs were housed?

8  A.   Yes.  There's two doors, one on each end of the tier.

9  Q.   Do you know whether or not he locked that door when he

10  left?

11  A.   No, it was open.  He left it open.

12          MR. KISOB:  That will be all for the witness, Your

13  Honor.  Thank you, Mr. Gay.

14          THE COURT:  Cross-examination.

15                    CROSS-EXAMINATION

16  BY MS. KELLY:

17  Q.   Good afternoon, Mr. Gay.

18  A.   Good afternoon.

19  Q.   You are serving a sentence of life without parole right

20  now; correct?

21  A.   Yes.

22  Q.   And you're at -- is it Cochran where you are?

23  A.   Yes.

24  Q.   Okay.  And you had stated earlier that you were handcuffed

25  when you were taken from your cell.  Did you have a walker that

1    you were using to ambulate with at that time?

2    A.    Yes.

3    Q.    So were you handcuffed behind your back or handcuffed to

4    the walker or how was that?

5    A.    I was handcuffed to the walker.

6    Q.    Okay.  And so when you decided that you were going to step

7    into the shower instead of go back to your cell as Deputy Ynigo

8    asked you to do, were you still handcuffed to your walker?

9    A.    Yes.

10    Q.    And so you don't typically shower with your hand

11    handcuffed to the walker; right?

12    A.    No.  After I step into the shower, and he locks the gate

13    to the shower, then he'll reach in and take the cuffs off.

14    Q.    So I understand, so your decision to continue with your

15    shower was that before or after the shower bag was returned to

16    Mr. Jones' cell?

17    A.    After.

18    Q.    And before -- strike that.

19        When he retrieved the shower bag belonging to Mr. Jones

20    from his cell, you were standing in front of the shower door

21    but had not yet entered it; is that right?

22    A.    Right.

23    Q.    So in your experience having lived at the 7000 row when

24    you were living there before you were transferred to where you

25    are now, did the deputies typically lock the end gate to the

1   row when they were leaving as opposed to leaving it open as

2   Deputy Ynigo did this day?

3   A.    It's never left open.

4   Q.    Yeah.  So they usually lock it when they leave and they

5   usually never leave it open; right?  When they leave the tier?

6   A.    Right.

7   Q.    Okay.  And so at that point, when he left the tier, you're

8   standing in a shower with your hand cuffed to the walker with

9   no water on?

10  A.    Right.  No water on.  He hadn't turned the water on.

11  Q.    So your memory next is that the people came back, the

12  deputies and the nurse; correct?

13  A.    Right.

14         MS. KELLY:  Okay.  I have no further questions.

15  Thank you.

16         THE COURT:  Okay.  Next witness.

17         MR. KISOB:  Redirect, Your Honor?

18         THE COURT:  Okay.

19         MR. KISOB:  Sorry, Your Honor.

20                     REDIRECT EXAMINATION

21  BY MR. KISOB:

22  Q.    Mr. Gay?

23  A.    Yes.

24  Q.    Shortly after the incident, you made a statement in

25  regards to what had transpired between the plaintiff and Deputy

```
1    Ynigo; correct?
2    A.    That's right.
3    Q.    If I play a video of that statement, would that be able to
4    refresh your recollection?
5    A.    Yes.
6              MS. KELLY:  Objection, Your Honor.
7              THE COURT:  I don't know what video you are playing.
8    Did you record a video of the conversation Mr. Gay?
9              THE WITNESS:  Yes, with the Lieutenant.
10             THE COURT:  You recorded a conversation?
11             THE WITNESS:  A Lieutenant came on the tier and
12   interviewed me about the incident and he had a video recorder.
13             THE COURT:  And in this video recording, are you
14   saying that the Lieutenant played a video that the Lieutenant
15   said he had of the conversation?
16             THE WITNESS:  No, no.  The Lieutenant recorded my
17   statement.
18             THE COURT:  Oh, in other words, you were interviewed
19   by the Lieutenant about what you're testifying to now; correct?
20             THE WITNESS:  Yes.
21             THE COURT:  Is that the video you're referring to?
22             MR. KISOB:  Correct, Your Honor.
23             THE COURT:  You can't play it.
24             MR. KISOB:  To refresh his recollection, Your Honor.
25             THE COURT:  He remembers what happens.
```

```
 1              THE WITNESS:  It's been a while.  I mean --
 2              THE COURT:  There is no question pending.  You can't
 3    play the video.  Now, this is redirect.  If you have further
 4    questions, ask them.
 5    BY MR. KISOB:
 6    Q.   Mr. Gay.
 7    A.   Yes.
 8    Q.   I am going to play what is in evidence and marked as
 9    Exhibit Number 6, I believe.  Just tell me if you can see once
10    I start playing it.
11              MS. KELLY:  Objection.  Relevance.  Exhibit 6 is the
12    silent tier video.
13              THE COURT:  Is that -- is video 6 the video of the
14    event?  Is that what it is?
15              MR. KISOB:  Yes, Your Honor.
16              MS. KELLY:  Your Honor, the portion in Exhibit 6 is
17    the response people walking away.  It's not the incident.  It's
18    Bates --
19              THE COURT:  Then that video is not relevant.  I'll
20    sustain the objection.  If there is another video you have in
21    mind you can call it up.
22              MR. KISOB:  Your Honor, Exhibit 6 is not the video of
23    the response.  It's actually the video of the incident.
24              THE COURT:  If that -- I can't remember the exhibit
25    numbers in the videos but it does seem to me 6 is the video of
```

---

the incident; correct?

MR. KISOB: Yes, Your Honor.

THE COURT: All right. Do you want to play it for him?

MR. KISOB: Yes, Your Honor.

THE COURT: Go ahead.

BY MR. KISOB:

Q. Just a moment, Mr. Gay, I'm trying to connect to the Court system. Can you see the video, Mr. Gay?

A. No.

Q. Is there any video on your screen?

MR. KISOB: It's playing on Apple Play, but I don't see it own the screen.

THE COURTROOM DEPUTY: I am not tech person. I can call IT.

THE COURT: Look, it's your responsibility to get these things visible to the Court and jury, so either get it before him or we have to move forward.

BY MR. KISOB:

Q. Okay. Mr. Gay, I have just one question for you. As you sit here today, is there any other thing about this incident that might have escaped your recollection that you can now think of and that you're willing to say?

MS. KELLY: Objection. Vague and ambiguous.

THE COURT: Sustained.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

```
1            MR. KISOB:  That will be all for the witness.
2            MS. KELLY:  No questions.
3            THE COURT:  Thank you, Mr. Gay.  Take him off the
4    screen.  Call the next witness.
5            MR. KISOB:  Your Honor, at this time plaintiff would
6    call Mr. Lafonzo Turner.
7            THE COURT:  Who is that?  I told you --
8            MR. KISOB:  Forgive me, Your Honor.
9            THE COURT:  Who is the next witness?
10           MR. KISOB:  The next witness will be the expert.
11           THE COURT:  Is he here?
12           MR. KISOB:  He's only available at 1 p.m. tomorrow.
13   That is the last witness.
14           THE COURT:  Do you have any other witnesses?
15           MR. KISOB:  No.  That is the last witnesses.
16           THE COURT:  Then you rest.  Any witnesses from the
17   defense?
18           MS. KELLY:  Your Honor, we had the rebuttal --
19           THE COURT:  Any witnesses from the defense?  Yes or
20   no?
21           MS. KELLY:  Yes.
22           THE COURT:  Who is that person?
23           MS. KELLY:  The rebuttal witness Dr. Friedman who is
24   also not available until tomorrow afternoon.
25           THE COURT:  All right.  So you rest also.  The jury
```

1    has now heard all the evidence.  It's my duty --

2            MR. STEPANYAN:  Your Honor, may we have a sidebar

3    please?

4            THE COURT:  About what?

5            MR. STEPANYAN:  Just to discuss the issue outside the

6    presence of the jury.

7            THE COURT:  All right.

8        (Sidebar commenced.)

9            MR. STEPANYAN:  Okay.  Your Honor, this is on behalf

10   of the defendant.  We are -- if the state of the evidence we

11   are going to move for judgment as a matter of law based on

12   qualifying immunity.

13           THE COURT:  I'm denying the motion.

14           MR. KISOB:  At this point, plaintiff's move for

15   judgment as a matter of law.

16           THE COURT:  I'm denying that motion.

17           MR. STEPANYAN:  At least we have to be given

18   opportunity to file with the Court the paper so is the Court

19   can consider the written documents in light of --

20           THE COURT:  You can file the documents you want at

21   the appropriate time.  Right now, I am trying to get this case

22   to the jury.

23           MR. STEPANYAN:  Okay.  Just for the record, this is

24   judgment as a matter of law based on qualified community.  The

25   action the deputy --

1        THE COURT:  I understand.

2        MR. KISOB:  Your Honor, plaintiffs also filed a Rule
3  50 A motion based on the excessive force claim.  We believe
4  that we have proven that the deputies were done maliciously and
5  sadistically, and also the Court had instructed that, if the
6  parties come to an agreement in relation to their experts, the
7  Court would be willing to accommodate that.

8        THE COURT:  I said that at one point.  I may have
9  said that but I said yesterday at the pretrial conference
10 actually and there were tremendous delays in the first trial
11 that if the experts were not available, the case would end when
12 the parties exhausted their witnesses.  It is now not even
13 close to 5:00.  It's ten to 3:00.  I am not going to make this
14 jury go home and come back another day.  The expert's are
15 supposed to be here and the parties are supposed to make them
16 available.  There is no flexibility.  But not dismissing jury
17 at ten to three.  That's it.

18        MS. KELLY:  May I make a suggestion on cutting --

19        THE COURT:  No suggestions.

20        MS. KELLY:  We can submit on the reports.

21        THE COURT:  There is nothing.

22    (Remainder not included in request.)

23    (Adjourned at 2:51 p.m.)

24                        -oOo-

25

```
1                       REPORTER'S CERTIFICATE
2

3

4

5          I certify that the foregoing is a correct transcript of
6      proceedings in the above-entitled matter.
7

8      /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                                Date:  10/15/2024
9      United States Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```