# EXHIBIT C

1

2                     UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
3          HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE

4    _____

     LARRY JONES,                  |
5                                  |
                     Plaintiff,    |
6                                  |
     VS.                           | No. 2:24-CV-01388-SVW-ADS
7                                  |
     COUNTY OF LOS ANGELES, ET AL |
8                                  |
                     Defendants.   |
9    _____

10

11          **EXCERPTED TESTIMONY OF DEPUTY IRA YNIGO**

12          REPORTER'S TRANSCRIPT OF JURY TRIAL - DAY 2

13                      LOS ANGELES, CALIFORNIA

14                     FRIDAY, AUGUST 16, 2024

15                           9:00 A.M.

16

17

18

19

20

21   _____

22

23               APRIL LASSITER-BENSON, RPR
                FEDERAL OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT
24             350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA 90012
25                     (213)894-3539

1                           - A-P-P-E-A-R-A-N-C-E-S -

2

3      For the Plaintiff:

4                              **MR. APEMWOYAH KISOB ALARIC-LORENZO**
                               KISOB LAW FIRM
5                              3680 WILSHIRE BOULEVARD
                               SUITE P 04-1147
6                              LOS ANGELES, CA 90010
                               (702)863-4243
7                              alkisob@kisoblaw.us

8

9

10     For the Defendant, County of Los Angeles:

11                             **MS. LENORE CABREROS KELLY**
                               COLLINSON DAEHNKE INLOW & GRECO
12                             21515 HAWTHORNE BOULEVARD
                               SUITE 800
13                             TORRANCE, CA 90503
                               (424)212-7777
14                             lenore.kelly@cdiglaw.com

15

16

17

18

19

20

21

22

23

24

25

1                          - I-N-D-E-X -

2

3        <u>**EXAMINATION OF IRA YNIGO**</u>

4        Direct Examination (continued)
         By Mr. Alaric-Lorenzo                    5
5
         Cross-Examination
6        By Ms. Kelly                            26

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    APRIL LASSITER-BENSON, RPR
         UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    FRIDAY, AUGUST 16, 2024; 9:00 A.M.

 2                        LOS ANGELES, CALIFORNIA

 3          ----------------------------------------------

 4                    (WHEREUPON, additional matters were heard by

 5                    the Court, after which the following excerpt

 6                    of Deputy Ira Ynigo's testimony from the

 7                    proceedings was requested as follows out of

 8                    the presence of the jury:)

 9          MR. ALARIC-LORENZO:  Your Honor, I think we

10   ended yesterday when I was cross-examining, or examining

11   Mr. Ynigo.  It was plaintiff that was questioning him,

12   not defendant.

13          THE COURT:  You hadn't started your direct

14   [sic] examination yet?

15          MR. ALARIC-LORENZO:  No.

16          THE COURT:  Okay, then, you have 20 minutes,

17   and you have 10 minutes to complete.

18          MR. ALARIC-LORENZO:  Understood, Your Honor.

19          THE COURT:  Unless something develops that

20   requires more time, which, by now, I don't think it will,

21   that's it.  Let's get-going.

22          MR. ALARIC-LORENZO:  Your Honor.

23          THE COURT:  Please, no.  Nothing.  Let's

24   get-going.

25                    (WHEREUPON, the following matters were heard
```

5

1  in open court in the presence of the jury, as follows:)

2         THE COURTROOM DEPUTY:  Can we have the witness

3  back on the stand, please?

4         THE COURT:  Good morning, Members of the Jury.

5  We're ready to proceed.

6         THE COURTROOM DEPUTY:  The witness is reminded

7  he's still under oath.

8         THE WITNESS:  Okay.  Thank you.

9

10                    *   *   *

11                  IRA YNIGO,

12  having been already duly sworn, resumed the witness stand

13  and testified further as follows:

14

15           CONTINUED DIRECT EXAMINATION

16

17  QUESTIONS BY MR. ALARIC-LORENZO:

18  Q.   Good morning, Mr. Ynigo.

19  A.   Good morning.

20         MR. ALARIC-LORENZO:  Your Honor, may I ask the

21  court reporter to read the last question I asked the

22  witness yesterday?

23         THE COURT:  Okay.  Would you do that, Madam

24  Court Reporter?

25         (WHEREUPON, the court reporter read back the

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                     pending question, as follows:)

 2

 3                     QUESTION:  "and did you not tell him as a

 4                     reason for why you were asking him to go back

 5                     to his cell or get back in the shower, did you

 6                     not provide or supply as on a reason for that,

 7                     the fact that plaintiff is acting like a

 8                     motherfucker?"

 9                     ANSWER:  "I did not, no."

10

11                     (WHEREUPON, the court reporter concluded

12                     read-back.)

13    BY MR. ALARIC-LORENZO

14    Q.    Deputy Ynigo, please turn to Exhibit Number --

15    A.    Yes.

16    Q.    Just a moment.

17          Exhibit Number 6.  So, I'm going to play

18    this video and I'll ask you some questions based on

19    the video, and then we'll be done.

20          And before the video starts playing, let me

21    ask you quickly, did you ever see the tag that

22    Mr. Jones always had around his hand in jail?

23    A.    I'm sorry, the what?

24    Q.    The tag -- the name tag for the inmate, the

25    plaintiff; did you ever see the name tag?
```

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

7

```
 1    A.    They don't wear name tags now.  Are you talking

 2   about, like, the wrist band?

 3    Q.    Yes, the wrist band?

 4    A.    It has identification on it?  Yes, if he chose to

 5   wear it -- on and/or off as they please.

 6    Q.    And you're familiar with these name tags, right?

 7    A.    Yes.  It's a violation of policy to remove them,

 8   but ...

 9    Q.    And what -- if you see the letter "H" on the name

10   tag, wouldn't that mean that that the inmate is hostile?

11    A.    Yes.

12    Q.    Did you ever see the letter "H" on Mr. Jones's name

13   tag?

14    A.    I do not remember.  That was over a year ago.

15    Q.    Let me play this video.

16         MS. KELLY:  Objection, your Honor.  May we

17   have a foundation for the video that he's about to turn

18   on?  I don't know what he's --

19         THE COURT:  What is it?

20         MR. ALARIC-LORENZO:  It's Exhibit Number 6,

21   Your Honor, which is in evidence.

22         THE COURT:  Okay, then, you can play it.

23         MR. ALARIC-LORENZO:  Sorry, Your Honor, just a

24   minute.  I'm trying to get it to work.

25         (Playing video.)
```

1    *BY MR. ALARIC-LORENZO*

2    Q.    Is that you escorting plaintiff to his cell?

3    A.    Yes.

4    Q.    And is that you closing the door?

5    A.    Yes.

6    Q.    Did you use your foot?

7    A.    What was that?

8    Q.    Did you use your foot when you just closed the door

9    in the video?

10    A.    No.

11    Q.    What is this door; the door is just opened?

12    A.    That is the closet with the shower controls.  I run

13    the water so that it's warm for the next person that's

14    about to go in.

15    Q.    Okay.  Did you close that door?  You didn't, right?

16    A.    I did not.  It doesn't have a locking mechanism on

17    it.

18              (Playing video.)

19    Q.    Is this Mr. Gay's door that you're just opening

20    now?

21    A.    Uh, I don't remember.

22    Q.    You opened this door so the person in there could

23    go use the shower, correct?

24    A.    Yes.

25              (Playing video.)

1   Q.   What are you doing now?

2        You're facing the other direction, correct?

3        You're facing the wall, correct?

4   A.   Yes.  That's Mr. Gay's cell.  He asked me about

5   something on the TV.

6   Q.   And your back is facing -- so, basically facing --

7   A.   Facing the wall, yes.

8   Q.   So, your face is facing the wall, and then you're

9   back in his cell, correct?

10  A.   Yes, but with my sergeant present as well.

11  Q.   No.  Was your Sergeant standing right in front of

12  Mr. Gay's door?

13  A.   I would not know that information.  I'm not looking

14  at my sergeant at the moment in the video.

15  Q.   Your sergeant appears to be talking to another

16  prisoner or inmate, correct?

17  A.   Yes, that's the last ops I had on my sergeant.

18  Q.   Yes, your serg- -- are you observing him right now

19  in the video?  Look in the video.

20  A.   No, but I could hear him.

21  Q.   But you're not seeing him with your eyes, right?

22  A.   No.

23  Q.   Okay.  So, it is fair to say he was not present,

24  like, right there in front of Mr. Gay's door with you?

25  A.   I wouldn't know that.

1        **MS. KELLY:**  Objection, Your Honor.

2   Argumentative.  The video speaks for itself.

3        **MR. ALARIC-LORENZO:**  I'll move on.

4   *BY MR. ALARIC-LORENZO*

5   *Q.*   At this point, are you scared for your life?

6   *A.*   At that point, no.  I work in the K10 row.  It's up

7   and down.  You never know.  You're not working with kids,

8   you know.

9        **MR. ALARIC-LORENZO:**  Your Honor, we move to

10  strike the remainder of the response.

11       **THE COURT:**  Stricken.

12  *BY MR. ALARIC-LORENZOJ*

13  *Q.*   Did you cuff Mr. Gay after you opened his door?

14  *A.*   I did not.  I did not, no, under no conditions.  I

15  do know he uses a walker, though.

16       **MR. ALARIC-LORENZO:**  Your Honor, strike the

17  remainder of the response.  We move to strike.

18       **THE COURT:**  Stricken.

19       (Playing video.)

20  *BY MR. ALARIC-LORENZO*

21  *Q.*   You left Mr. Gay's door opened and walked away,

22  correct?

23  *A.*   In the video it shows that, yes.

24  *Q.*   You entered the closet, correct?

25  *A.*   Yes.

1    Q.    And Mr. Gay's door is still open?

2    A.    Yes.

3    Q.    Mr. Gay is a K19, you said, correct?

4    A.    Yes, at the time.

5          (Playing video.)

6    Q.    Is this Mr. Gay walking out of his cell door?

7    A.    That is Mr. Gay, yes.

8    Q.    Mr. Gay just closed his cell door, correct?

9    A.    Yeah, he shoved it closed.

10   Q.    Did he appear to use any sort of -- he did not need

11   to use his foot to shut that door, correct?

12   A.    He used body weight.

13         **MS. KELLY:**  Objection.  The video speaks for

14   itself, Your Honor.

15         **THE COURT:**  Overruled.

16         **MR. ALARIC-LORENZO:**  His answer.

17         **THE WITNESS:**  He used his body weight, the

18   same as I do.  It's a four-pound door.

19   *BY MR. ALARIC-LORENZO*

20   Q.    Please answer the question.

21          He did not use his foot to shut that door,

22   correct?

23   A.    He did not, in the video, no.

24   Q.    As to your own memory on the day of the incident,

25   did he use his foot to shut the door?

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

12

1    A.    On the day of the incident, no.

2                (Playing video.)

3    Q.    And that's the shower door that's opened, right?

4    A.    Correct.

5    Q.    And while the shower door is opened you're turning

6    around to reopen plaintiff's door, correct?

7    A.    Yes.

8    Q.    And Mr. Gay is still standing there and making --

9    well, he's making his way into the shower, correct?

10   A.    Yes.

11   Q.    Did Mr. Gay ask you to reopen plaintiff's door?

12   A.    No.

13   Q.    Did plaintiff ask you to reopen his door while

14   Mr. Gay was making his way into the shower?

15   A.    Mr. Gay would not enter the shower unless I removed

16   the shower bag that was in there.

17   Q.    How would you know that?

18   A.    Because he told me that.   I was there.

19   Q.    Unless you removed the shower bag?

20   A.    Yes.

21   Q.    Is that the same thing unless you reopen

22   plaintiff's door?

23          MS. KELLY:   Objection; argumentative.

24          THE COURT:   Overruled.

25          MR. ALARIC-LORENZO:   His answer.

1          **THE WITNESS:**  Repeat the question, please.

2     *BY MR. ALARIC-LORENZO*

3     *Q.*    You said Mr. Gay would not allow you to reenter

4     the -- he would not enter the shower unless you took the

5     bag --

6              (Simultaneous, unreportable crosstalk.)

7     *A.*    I'm sorry, can you repeat that?

8     *Q.*    I'm saying, you did say that Mr. Gay would not get

9     into the shower unless you removed plaintiff's shower

10    bag, correct?

11    *A.*    Correct.

12    *Q.*    Did he tell that you he would not get into the

13    shower unless you reopened plaintiff's door and handed

14    plaintiff his shower bag?

15    *A.*    I do not remember him telling me that, no.

16    *Q.*    Is there a point in this video where Mr. Gay -- we

17    see Mr. Gay talking to you and telling you that he would

18    not reenter the shower bag [sic] -- he would not enter

19    the shower unless you give plaintiff his bag?

20          **MS. KELLY:**  Objection.  Argumentative, Your

21    Honor.

22          **THE COURT:**  Overruled.

23          **MR. ALARIC-LORENZO:**  His answer.

24          **THE WITNESS:**   I'm sorry, what were you saying?

25

```
 1    BY MR. ALARIC-LORENZO
 2    Q.    In this video I just played --
 3    A.    Yes.
 4    Q.    -- can you tell me exactly where we see you talking
 5    with Mr. Gay just before you handed the plaintiff his
 6    bag?
 7    A.    Could you my rewind?  Further.  That's after.
 8            (Playing video.)
 9            I already have the bag in my hand as you can
10    see.
11    Q.    That's you opening the door, correct?
12    A.    Yes.
13    Q.    That's Mr. Gay trying to make his way in, correct?
14    A.    Yes.
15    Q.    And while he's trying to make his way in, you
16    removed the bag, correct?
17    A.    Yes.
18    Q.    And then you decide to reopen plaintiff's door,
19    correct?
20    A.    Yes.  The bag would not fit through the tray slot.
21    Q.    And you had closed the tray slot, so you had to
22    open the door to give it back to him, correct?
23    A.    Yes, after instructing Larry to sit down on his
24    bunk.
25    Q.    And then what do you do?
```

1          And then you go ahead and kick the door

2    shut, correct?

3    A.      Yes, for my security and safety.

4              **MR. ALARIC-LORENZO:**  We move to strike the

5    remainder of the response, Your Honor.

6              **THE COURT:**  Stricken.

7    *BY MR. ALARIC-LORENZO*

8    *Q.*    Is there any reason why you had to use your foot to

9    kick plaintiff's door shut at this time when initially

10   when you returned him back to his cell or escorted him

11   back to his cell after he took his shower, you didn't use

12   your foot?

13   *A.*    It's as needed.  The doors are very old.  The jail

14   was built in the 1950s, sir.  It's right across from the

15   shower.  Most of the mechanisms are rusting.

16   *Q.*    You knew this the very first time when you escorted

17   him back into his cell --

18   *A.*    You also see the force I put into it the first

19   time.  I used most of my body weight, where you see I'm

20   further away from the door, so this system I put does

21   help.

22   *Q.*    When you say, "Body weight," how much do you mean?

23          How much do you weigh?

24   *A.*    About 250 lbs.

25          (Simultaneous, unreportable crosstalk.)

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      **THE COURT:**  Stand up when you make an

2    objection.

3      **MS. KELLY:**  Relevance, Your Honor.

4      **THE COURT:**  Overruled.

5    *BY MR. ALARIC-LORENZO*

6    Q.    How much do you weigh?

7    A.    About 250 pounds.

8    Q.    And you put all of that weight -- you used all of

9    that body weight when you kicked that door shut?

10   A.    I wouldn't say all of that.  I don't think, like, I

11   drop-kicked the door, you know, like, my legs were on the

12   ground so I removed some weight, and then ...

13   Q.    You observed Mr. - well, let me strike that.

14         And then, we see you turning and talking to

15   Mr. Gay, correct?

16   A.    Yes.

17   Q.    What did you tell him, or what were you saying, do

18   you remember?

19   A.    I was asking him to either return to his cell or

20   get in the shower so I could secure him.

21   Q.    Why?

22   A.    Because an event just occurred.  I had no idea what

23   was going on at the time.

24   Q.    What event just occurred?  Sorry.

25   A.    I heard Larry screaming at me in a hostile manner,

1    screaming things like, "You fucked up.  I got you now,

2    motherfucker."

3              **MR. ALARIC-LORENZO:**  Move to strike the

4    remainder of the answer, Your Honor.

5              **THE COURT:**  Overruled.

6                  I mean, the Motion to Strike is denied.

7    The answer can stand.

8    *BY MR. ALARIC-LORENZO*

9    *Q.*    So, you would ask Mr. Gay to go back into his cell

10   because plaintiff Jones was yelling inside his cell; that

11   is your testimony, correct?

12   *A.*    Correct.  I can only do one thing at a time.  I'm

13   only one person and I have to secure every inmate on that

14   row before I can do anything else.

15             **MR. ALARIC-LORENZO:**  Your Honor, we move to

16   strike the remainder of the --

17             **THE COURT:**  The rest can say.

18             **THE WITNESS:**  As you said, he's a K- --

19             **THE COURT:**  No question pending.

20   *BY MR. ALARIC-LORENZO*

21   *Q.*    You did not -- did you not realize that Plaintiff

22   Jones' finger was trapped in the cell door?

23   *A.*    At that time, I did not.

24   *Q.*    When inmates yell inside their cell door -- inside

25   their cells, does that stop you from carrying on with

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1  whatever activity you were carrying -- you were doing at

 2  the time?

 3  A.    I'm sorry, what?

 4  Q.    Would you stop whatever activity you're doing at

 5  the time, just because an inmate is yelling inside a cell

 6  door?

 7  A.    It depends on the activity.  If there's a ~~fight~~ I

 8  need to stop, if someone's being stabbed, obviously, that

 9  would take priority.

10  Q.    The question is:  Just because someone is yelling

11  inside their cell.

12  A.    No, because most of the time it's a rouse.

13  Q.    So then why was this not a rouse?

14        Isn't it because you knew?

15  A.    Because by the time you see in the video -- I'm

16  sorry.  Go ahead.

17  Q.    This wasn't a rouse because you knew that plaintiff

18  Jones' door -- finger was trapped in his cell door,

19  correct?

20  A.    No.

21        **MS. KELLY:**  Objection.  Lacks foundation.

22  Argumentative.

23        **THE COURT:**  Overruled.

24        **MR. ALARIC-LORENZO:**  His answer.

25        **THE WITNESS:**  Repeat the question.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    *BY MR. ALARIC-LORENZO.*

2    Q.    Please repeat the question.

3              (WHEREUPON, the court reporter read back the

4              pending question, as follows:)

5

6              QUESTION:  "This wasn't a rouse because you

7              knew that plaintiff Jones' door -- finger was

8              trapped in his cell door, correct?"

9

10             (WHEREUPON, the court reporter concluded

11             read-back.)

12             **THE WITNESS:**  Correct.

13   *BY MR. ALARIC-LORENZO*

14   Q.    Mr. Gay refused to go back to his cell, correct?

15   A.    Yes.

16   Q.    And then you --

17   A.    You can hear as going to the shower.

18   Q.    You walked away, correct.

19   A.    After securing Gay.

20   Q.    And when you walked away you heard plaintiff

21   screaming, correct?

22   A.    Yes.

23   Q.    Did you go back to try and figure out where you

24   could free -- what the issue was, if you did not know?

25             Did you go back and try to figure out what

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

20

1   the issue was?

2   *A.*    After seeing his bloody hand through the window and

3   him smacking the door in a hostile manner, I did not.  I

4   am not a medical professional.  There was nothing I could

5   do there.

6   *Q.*    I have a few more questions and then I'm done, Your

7   Honor.

8         Please turn to Exhibit Number 3.

9   *A.*    One second.  The second video?

10  *Q.*    I'm going to play it shortly, don't worry.

11          (Playing video.)

12        Who is the gentleman, the deputy -- look,

13  I'm going to point him out to you, then you can

14  tell me, yes.

15        Who is this; the deputy on the far right

16  side of the screen?

17        You know him?

18  *A.*    I did not know him.  I was not there.

19  *Q.*    Is it, you don't know him, or you were not there;

20  which one?

21  *A.*    No, I was not there, so I ...

22  *Q.*    Do you know him?

23  *A.*    I know of him.  I do not know his name.  I don't

24  work with him.  He's not a regular on that floor.

25  *Q.*    Can you see on the right side of the doorframe?

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

21

1    That is a finger that seems to be protruding from that

2    door, correct?

3            **MS. KELLY:**  Objection.  The video speaks for

4    itself and the witness has indicated he wasn't present.

5            **THE COURT:**  I mean, if you ask him if that's

6    what he saw when he actually saw it, you can ask him

7    that, but this video speaks for itself.  He wasn't there

8    then.

9    *BY MR. ALARIC-LORENZO*

10   *Q.*   You saw this finger protruding through the

11   doorframe when you walked away, correct?

12   *A.*   I did not.

13   *Q.*   You would agree that if you were standing in front

14   of that door, if you closed that door you would have been

15   able to see this, correct?

16           **MS. KELLY:**  Objection.  Argumentative.

17   Misstates prior testimony.

18           **THE COURT:**  He can answer the question, "yes"

19   or "no."  I don't know.

20           **THE WITNESS:**  Repeat the question.

21   *BY MR. ALARIC-LORENZO*

22   *Q.*   You would agree with me that if you were standing

23   in front of that door and then you shut it and then you

24   walked away, you would have seen this finger if it had

25   become trapped in the door, correct?

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Is that, like, before or, like, right now?

2          Are you talking about the video right now?

3    Q.    I'm talking about when you shut the door and walked

4    away.  You would agree that if the finger had been

5    trapped in this position, you would have been able to see

6    it, correct?

7               MS. KELLY:  Objection.  Argumentative.

8               THE COURT:  Overruled.

9               MR. ALARIC-LORENZO:  His answer.

10              THE WITNESS:  Wrong.  I was more paying

11   attention to Inmate Gay that was still out and unsecure.

12   *BY MR. ALARIC-LORENZO*

13   Q.    Did you not tell Mr. Gay that he should return to

14   his cell because, referring to plaintiff, this

15   motherfucker is acting up?

16          Did you not use those words?

17   A.    I don't remember if I used those words, no.

18   Q.    When you walked away, who was the first person that

19   you spoke with after you walked away, after shutting the

20   door?

21   A.    I don't remember the exact first person I spoke

22   with after I left.

23   Q.    Who do you remember talking to?

24   A.    I -- I don't remember.  That was over a year ago,

25   sir.  Almost a year ago.  I don't remember who was the

23

```
 1    exact first person.
 2    Q.    I mean, wasn't it you who summonsed help?
 3    A.    Yes.
 4    Q.    Oh, you did not do it?
 5    A.    Yes, I summonsed help.
 6    Q.    So you don't remember who you spoke to?
 7    A.    No, everything happened so fast.
 8    Q.    Where did you go?
 9          After shutting the door, where did you go?
10    A.    I went outside the row and I contacted medical
11    personnel and my partners.  I do not know the order.
12    Q.    When you say, "Medical personnel," who do you mean?
13          Who are you referring to?
14    A.    Everyone on the floor is medical personnel that
15    isn't an inmate and a deputy.  There's several doctors,
16    nurses, physicians on that floor.  It's a hospital floor.
17    Q.    In your estimation, about how much time had lapsed
18    between when you shut the door and when you first told
19    someone about the incident?
20    A.    In an estimate, I'm not sure.  It seemed like
21    seconds.  I'm sure minutes went by.
22    Q.    Did you return about with the people who went to
23    check on plaintiff?
24          Did you go back to the cell?
25    A.    I did not.
```

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

24

```
1    Q.    Why not?

2    A.    Because I wanted to remove myself from the

3    incident.  After having a hostile inmate, you're not

4    suppose to go back.

5          MR. ALARIC-LORENZO:  Your Honor, we move to

6    strike the remainder of his response.  He said --

7          THE COURT:  His answer can stand.

8          THE WITNESS:  I don't want to further agitate

9    him.

10   BY MR. ALARIC-LORENZO

11   Q.    You testified that he was yelling, and that was

12   your understanding of what was going on.  And then you

13   went and called medical personnel.  You're calling

14   medical personnel to respond to someone who is yelling.

15   Is that the procedure in jail, at the Men's Central Jail?

16   A.    It wasn't just the yelling.  I had mentioned that I

17   saw his bloody hand in the window as he was smacking it.

18   Q.    And you agree that you did nothing to investigate

19   the cause of that blood, correct?

20         MS. KELLY:  Objection, Your Honor.

21   Argumentative.  We've been over this.

22         THE COURT:  He can answer.  I don't know what

23   "investigate" means.  What does that mean?

24         THE WITNESS:  I deemed an investigation would

25   be a waste of time.  I just wanted to get him medical
```

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  help as soon as possible.

2  *BY MR. ALARIC-LORENZO*

3  Q.   Is it your testimony that blood -- an investigation

4  as to why an inmate has blood, is a waste of time,

5  correct?

6         **MS. KELLY:**  Objection.  Argumentative.

7         **THE COURT:**  I mean, you can answer "yes" or

8  "no".  I mean, I don't know what the answers are here.

9         **MR. ALARIC-LORENZO:**  His answer.

10        **THE WITNESS:**  Repeat the question, please.

11        **MR. ALARIC-LORENZO:**  Can I please have the

12 court reporter repeat?

13        **THE COURT:**  Just answer.

14         Would you -- would you agree that if you

15 investigated at that time, it would be a waste of

16 time?

17         Wasn't that the question?

18        **THE WITNESS:**  Yes.

19        **MR. ALARIC-LORENZO:**  Your Honor --

20        **THE COURT:**  That was about the question.  He

21 answered.  Let's move on.

22 *BY MR. ALARIC-LORENZO*

23 Q.   Is it not true that you were very, very annoyed

24 with plaintiff on the day of the incident and that was

25 the reason why you kicked his cell door shut on his

26

1    finger?

2    *A.*    That's false.

3              **MS. KELLY:**  Objection.  Argumentative.

4              **THE COURT:**  Overruled.

5              **MR. ALARIC-LORENZO:**  His answer.

6              **THE WITNESS:**  That's false.

7              **MR. ALARIC-LORENZO:**  That will be all for the

8    witness, Your Honor.

9              **THE COURT:**  Okay.  You can take him on direct

10   and ask him anything that related to the cross or any new

11   matter.

12             **MS. KELLY:**  Thank you, Your Honor.

13

14                      **CROSS-EXAMINATION**

15   QUESTIONS BY MS. KELLY:

16   *Q.*    Deputy Ynigo, we've been talking in this trial

17   about K18s and K19s.  What is a K18, based on your

18   employment at the 7,000 row?

19   *A.*    Well, it's a form of high power.  So when you come

20   to jail, there's K1 through  10.

21             **THE COURT:**  We went through this .the jury

22   heard this.  Move on.  Move on.

23   *BY MS. KELLY*

24   *Q.*    I'm going to take you to this time in the sequence

25   of events to when you first went to Mr. Jones' cell with

27

1  the sergeant after the banging that was testified here.

2  Can you take your memory there?

3  A.    Yes.

4  Q.    And at that time, did you let Mr. Jones out of the

5  shower to return to his cell?

6  A.    Yes.

7  Q.    And when you did that, can you describe what his

8  demeanor was like?

9  A.    Upset.  He's always upset.

10 Q.    And what was your demeanor like?

11 A.    Neutral.  You can't show any sort of favoritism or

12 anger.

13 Q.    And where was Inmate Gay at this time when you let

14 Mr. Jones out of the shower when you were standing there

15 with the sergeant?

16 A.    Inside of his cell.

17 Q.    And do you recall whether or not there was

18 discussion from Mr. Jones' side as he was leaving the

19 shower to go back to his cell?

20 A.    Not that I recall.

21 Q.    Do you recall whether he was expressing to you any

22 complaint about having fallen in the shower?

23 A.    No, that would need an injury report, if he fell in

24 the shower.  And my sergeant was there, so he should have

25 reported it to my sergeant.

1    Q.    Do you have any recollection of whether he

2    discussed with you that he wanted to see a sergeant about

3    falling in the shower?

4    A.    No, he did not.

5    Q.    And this is when you're letting him out of the

6    shower, he had completed his shower, right?

7            You didn't cut it short or anything?

8    A.    Yes.

9    Q.    And so, do you recall whether or not at that time

10    he was expressing to you, annoyance or anger with respect

11    to wanting to continue his telephone call?

12    A.    That's a daily thing.  Yes, that's common.

13    Q.    But that day, do you recall him, as he's leaving

14    the shower to go back to his cell, saying, I want to

15    finish my phone call that I was on?

16    A.    Yes.

17    Q.    Let's talk about the phone call, briefly.  Before

18    you put him in the shower, he was on the phone, right?

19    A.    Yes.

20    Q.    And you were the one that showered him that day

21    after he got off the phone?

22    A.    Yes.

23    Q.    And so, the phone stand, which we've looked at in

24    this trial, is the coat rack-looking thing with the

25    wheels on it, and it was in front of his cell?

29

1   A.    Yes.

2   Q.    Does the talking portion of the telephone fit

3   through the tray slot or does it all go inside the cell

4   with the stand?

5   A.    It stays outside the cell.

6   Q.    And so, when you came to ask Mr. Jones, okay,

7   you're up for the shower, and he said, I want to shower,

8   did you take steps at that time to terminate the use of

9   the telephone?

10  A.    No.  It was up for grabs, whoever wanted to use it.

11  Q.    But, I mean, as far as him ending his call and

12  coming out from the shower, it's one or the other, right?

13  A.    Yes.

14  Q.    And so, do you remember if he handed back that

15  talking portion of the telephone to you through the tray

16  slot?

17  A.    It's connected to that stand, so he just hung up

18  and I moved the entire stand out of the way.

19  Q.    Okay.  So, if it's connected to the stand, then it

20  was passed through the tray slot so that it could be

21  rejoined with the stand for whoever is going to use it

22  next, right?

23  A.    Yes.

24  Q.    And then you moved the stand out of the way so it

25  wouldn't be in the way for him to take a shower?

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          **MR. ALARIC-LORENZO:**  Objection, Your Honor.

2     Leading.

3          **THE WITNESS:**  Yeah

4          **MS. KELLY:**  Foundation.

5          **THE COURT:**  I mean, he said that many times

6     during trial.  I heard that.

7          **MS. KELLY:**  Okay.  I'll move on, Your Honor.

8     *BY MS. KELLY*

9     Q.    So, Mr. -- so, at this point, the sergeant that was

10    stand with you had left the tier, right?

11    A.    Yes.

12    Q.    And you opened his door and he walked -- did he

13    take the shower?

14         You put him in the shower?

15    A.    Yes.

16    Q.    And so, let's talk about the point where he's in

17    the shower.

18         Now, you described the bar door that is the

19    shower door, right, that's different from his?

20    A.    Correct.

21    Q.    And did you turn on the water in the closet next to

22    his cell like you did, that we saw in the video?

23         **MR. ALARIC-LORENZO:**  Objection, Your Honor.

24    Leading.

25         **THE COURT:**  Overruled.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

31

1          **THE WITNESS:**  Correct.

2     *BY MS. KELLY*

3     *Q.*    Okay.  So, were you able to turn on all the water

4     so that he started taking a shower?

5     *A.*    Correct.

6     *Q.*    Did you -- what did you do after he was starting to

7     shower, did you remain there or did you go do something

8     else?

9     *A.*    No, I had to do the rest of my duties, which is

10    like, cut passes for inmates that need to go places, and

11    begin my Title 15 walks.

12    *Q.*    And what's a Title 15 walk?

13    *A.*    On the hospital side, every 30 minutes we have to

14    conduct a walk of the inmates to make sure that they're

15    all alive, breathing well, if they need anything or Title

16    15 items (clothing/hygiene).

17    *Q.*    So, after you have got done doing all of that, what

18    was it that caused you to return to Mr. Jones' cell when

19    this incident happened?

20    *A.*    Well, the shower has a thin wall.  Behind it is a

21    sergeant's office, so he can hear all the conversations

22    and all the noise and everything that happens on the hard

23    row.

24          So, when I was in the booth cutting passes,

25    I took my radio off and put it on the charger so I

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  could charge it.  It takes about 20 minutes to run

2  all the inmates to their locations, where they need

3  to go for the day.  And my sergeant had come to me

4  and said that we need to go to the hard row because

5  someone's throwing a fit, someone's screaming.  I

6  didn't know who at the time.

7  *Q.*    Well, what did you do next after you were alerted

8  to this situation?

9  *A.*    I -- well, my sergeant told me to get up and go, so

10  I got up and went with him.

11  *Q.*    Where?

12  *A.*    To the 7,000 hard row.

13  *Q.*    And where on the hard row did you go?

14  *A.*    We went to the showers where we were met with

15  Inmate Jones that was upset for being left in the shower

16  for too long.

17  *Q.*    Okay.  So, at that point when you went back to the

18  shower after he had been taking a shower, was he still in

19  the shower?

20  *A.*    Yes.

21  *Q.*    No one else had let him out of the shower after you

22  had closed the shower for him to start showering, right?

23  *A.*    No.  When I do Title 15 walks I interchange the

24  inmates while I do the walks.

25  *Q.*    Okay.  So, let's talk about Inmate Gay.  And his

33

1    cell was how many doors down from Mr. Jones' cell?

2    A.    Two or three.

3    Q.    And so, how far away from the shower would you say

4    Mr. Gay's cell is?

5    A.    Ten steps from me.

6    Q.    And how long had you been working on the hard row

7    cell -- the hard row, excuse me, on September 19, 2023?

8    A.    A few months.

9    Q.    And to your recollection, was Mr. Gay also living

10    on that same row during the time that you were working

11    there?

12    A.    Correct.

13    Q.    Was that your regular assignment or were you what

14    they call a "floater" for that row?

15    A.    No, I was what they call a "hard body" because that

16    was my regular assignment.

17    Q.    And so, same question for Mr. Jones:  For the time

18    that you were working on the hard row, was Mr. Jones a

19    regular inmate living on that row?

20    A.    Yes.

21    Q.    But do you remember when he arrived, he arrived

22    shortly before the incident, though, right?  He was there

23    less than Inmate Gay?

24    A.    Yes.

25    Q.    So, when you returned to the hard row after doing

1    your other duties that you just talked about, was it at

2    that point that you determined that it was time for

3    Inmate Gay, the next person to shower to be let out?

4    A.    Yes, when the sergeant and I entered the row we

5    were approached by Gay and he had said, hey, I'm

6    showering next.

7    Q.    So, obviously, he was the next one that was going.

8    A.    Yes.

9         **MR. ALARIC-LORENZO:**  Objection, Your Honor.

10   Leading.

11        **MS. KELLY:**  Foundation.

12        **THE COURT:**  Overruled.

13   *BY MS. KELLY*

14   Q.    So --

15        **THE COURT:**  Don't respond to an objection.

16        The objection is overruled.

17   *BY MS. KELLY*

18   Q.    When you unlocked -- well, Mr. Gay's cell obviously

19   had to be unlocked in order for him to be next, right?

20   A.    Yes.

21   Q.    And when you unlocked his -- Mr. Gay's door, was

22   Mr. Jones still in the shower?

23   A.    No, he was not.

24   Q.    So he had already gone back into his cell and you

25   had closed the door?

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    *A.*    Yes.

2    *Q.*    All right.  And so, when Mr. Gay --

3              **MR. ALARIC-LORENZO:**  Objection, Your Honor.

4    Leading.

5              **THE COURT:**  Overruled.

6    *BY MS. KELLY*

7    *Q.*    When Mr. Gay -- when you opened the door for his

8    cell, do you recall where he was within his cell at that

9    time when you opened it to let him out to shower next?

10   *A.*    Yes, he was naked, sitting on his bunk in the back

11   of his cell.

12   *Q.*    And do you typically leave the door open until they

13   exit their cell for shower purposes so they can get ready

14   to go?

15   *A.*    Yes, because most of the inmates on the row have a

16   wheelchair, a walker, and a cane, or other medical

17   apparatuses in their cell.  It's not much room, so I

18   generally open the door so if they need to push the

19   wheelchair out of the way or outside just accommodate

20   them.

21   *Q.*    So when you -- we looked at the video of this

22   portion during the time counsel was questioning you.  Do

23   you recall at that time when you were waiting for him to

24   get -- for Inmate Gay to get ready, you recall hearing

25   your sergeant who was still in the area of the row,

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    talking to another inmate, right, he was still there?

2    A.    Yes, to the best of my knowledge, he was still

3    there.

4         (Simultaneous, unreportable crosstalk.)

5    Q.    And so, eventually, Inmate Gay came out of his cell

6    and walked towards the shower because he was next?

7    A.    Yes.

8    Q.    And so, did you engage in the same procedure as you

9    did before to go into the closet next door to start

10   running the water or did you leave it on?

11   A.    I don't remember, but I do run the water to make

12   sure it's warm before he gets in, so that way I don't

13   blast him with cold water or anything.

14   Q.    But is it your custom and practice to turn the

15   water off each time an inmate is done, or do you leave it

16   running so that you don't have to do that?

17   A.    I turn it off.

18   Q.    So, after Inmate Jones was done with his shower and

19   you put him back in his cell it would have been your

20   custom and practice to turn off the water?

21   A.    Yes.

22   Q.    So we're back at the point where Inmate Gay was

23   starting to walk towards the shower.  You unlocked the

24   barged shower door so he could get in?

25            **MR. ALARIC-LORENZO:**  Objection, Your Honor.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

37

1    Leading.

2                    **MS. KELLY:**  Foundation.

3                    **THE COURT:**  Overruled.

4                    **THE WITNESS:**  Correct.

5    *BY MS. KELLY*

6    *Q.*    And so, at this point we were discussing the shower

7    bag when counsel was questioning you, and it was your

8    testimony that Inmate Gay would not get in the shower

9    because someone else's stuff was in there?

10   *A.*    Yes.

11   *Q.*    And so, how much -- and so, was it your

12   intention -- what was your intention with respect to that

13   other person's property, Mr. Jones' property before

14   Mr. Gay would get in the shower?

15   *A.*    Well, if I let Gay in the shower and then remove

16   the bag, I didn't want Larry to accuse Gay of stealing

17   anything from his bag.  So, yes, I would have to move the

18   bag before, or just to make sure that nothing was left in

19   there by Larry, like a weapon or any other sort of thing.

20   For my security, I do have to check the shower.  So it

21   was good that I removed the bag beforehand.

22   *Q.*    Well, was it your custom and practice working on

23   that hard row to always check the shower for any items

24   regardless of whether they're laundry or a bag or

25   contraband, before the next person goes in, is that part

38

1    of your job?

2    A.    Correct.

3    Q.    Okay.  So, at the point when you were returning the

4    shower bag belonging to Mr. Jones, from the time that Gay

5    told you he wouldn't get in there, how much time would

6    you say it took for you to pick up the bag and turn

7    around towards Mr. Jones' cell to return it to him?

8    A.    Seconds.

9    Q.    And at that point was the shower door still open,

10   awaiting Mr. Gay to start his shower or did you close it?

11   A.    I believe it was still open.

12   Q.    And so, then, we saw the video where you then

13   opened up the door again to Mr. Jones' cell for the

14   purpose of returning the shower bag, right?

15   A.    Correct.

16   Q.    And how long would you say it took you to open the

17   door and hand him the bag?

18   A.    Seconds.

19   Q.    And at the time that you handed him the bag do you

20   remember what hand that he received it with or if he

21   received it at all, or if you even handed it to him?

22   A.    I do not.  I was focused on Inmate Gay.

23   Q.    And why is that?

24   A.    For my security.

25   Q.    And when you opened Inmate Jones' door, can you

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

39

1    estimate how much you opened it?

2    A.    Probably 45 degrees.

3    Q.    So that's halfway between open and shut?

4    A.    Yes.

5    Q.    And where were you standing in relation to

6    Mr. Jones' door after you had opened it 45 degrees?

7    A.    I was bladed.

8    Q.    What does that mean?

9    A.    I had a bladed stance and I used my foot to stop

10   the door to make sure it wasn't a rouse.

11   Q.    What does "bladed stance" mean?

12   A.    Like, at a slanted, one foot in front of the other,

13   like, if you were to hit a baseball or something of that

14   matter.

15   Q.    So -- well, let me ask the question this way.  If

16   you had his door -- Mr. Jones' door opened 45 degrees and

17   you said that you were standing bladed, which direction

18   would you be facing at that moment?

19   A.    Towards the right, since the door opens to my left,

20   because I want my strong foot on the door to stop it in

21   case he kicks it so --

22   Q.    Why did you have your foot behind the door?

23   A.    That's jail procedure, so when you open, like, a

24   hard cell door, or, like, a K10 door, you want to have

25   your foot on the door.

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And why do you do that?

2    A.    In case it's a rouse, like, if you need to retrieve

3    something or give them something or they call "man down",

4    it's fake and they drop kick the door and it flys in your

5    face, so the foot stops it in your face --

6    Q.    From open suddenly?

7    A.    Yes, from opening suddenly.

8    Q.    And so, let's go back to when you were starting to

9    tell us about, you now have his door opened 45 degrees

10   and you are bladed to his door, correct?

11   A.    Yes.

12   Q.    Turning -- and you said that you're facing to the

13   right because you're opening his door -- you're opening

14   his door?

15   A.    Yes.

16          **MR. ALARIC-LORENZO:**  Objection, Your Honor.

17   Leading.

18          **THE COURT:**  Overruled.

19   *BY MS. KELLY*

20   Q.    So, when you are -- at this moment, can you

21   describe how your bladed position was, with respect to

22   the shower door behind you where Mr. Gay was?

23   A.    It was -- whatever I sought fit, if I was attacked

24   by either inmate, I wouldn't stand a chance.

25   Q.    But the shower door that is behind you at this

1    point in time, right, where Mr. Gay is --

2    A.    Yes.

3    Q.    -- do you remember whether or not he was even in

4    the shower at that point?

5    A.    I do not.  I was listening to his walker scrape the

6    ground.

7    Q.    Okay.  But the shower door was opened behind you,

8    though, at that moment, right?

9    A.    Correct.

10   Q.    At the moment you are trying to return the bag to

11   Mr. Jones and the time that you opened the door, you had

12   both doors opened, his door and the shower door?

13   A.    Correct.

14   Q.    And how long would you say that it took you to

15   return the bag when you actually returned the bag?

16   A.    Seconds.

17   Q.    And do you have a memory of where -- whether

18   Mr. Jones had his hands anywhere near the door or the

19   doorframe to his cell when you returned the bag?

20   A.    No, because standard procedure is, I told him to

21   sit on his bunk and then I would open the door, toss the

22   bag in there or hand it to him if he's far enough back.

23   I would have had to feel safe in order for me to open

24   that door.

25   Q.    But you had said you couldn't tell us which hand

APRIL LASSITER-BENSON, RPR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that he received the bag with.   Do you even remember

2    whether you tossed it in or if you handed it in?

3    A.    I'm pretty sure I tossed it in his wheelchair that

4    was in front of the door, but, I don't remember.

5    Q.    So, at that point what was going through your mind

6    after you had returned the bag?

7          What were you going to do next?

8    A.    I needed to get Gay in that shower --

9    Q.    And why is --

10   A.    And close that door as fast as possible, for

11   security reasons.

12   Q.    And so, as soon as you closed the door, why did you

13   use your foot?

14   A.    To make sure it closed and so I could turn around

15   quicker to assess whatever Gay is doing.

16   Q.    And let's talk about the stray slot that was on

17   Mr. Jones' door.  There was questioning about that and I

18   want to revisit that with you.

19          Why did you close his tray slot before he

20   went into the shower?

21   A.    I don't remember if my sergeant told me to or if I

22   was -- just closed it to make sure that the showering

23   program is done for this inmate and whoever is next will

24   be next.  It depends on the program that day, too.

25   Q.    But after he chose to get off his phone call and to

1   take a shower so that he wouldn't lose his place in line,

2   do you recall whether or not the closing of the tray slot

3   had anything to do with him saying, I'm going to shower

4   instead of finish my call now?

5   *A.*     No.

6   *Q.*     And after you shut the door there was testimony

7   here that you heard him yelling.  What did you say

8   remember him yelling?

9   *A.*     When he was yelling at me he was yelling, I got you

10  now, motherfucker.

11          **MR. ALARIC-LORENZO:**  Your Honor, let me just

12  quickly open object to that question.  That is leading.

13          **THE COURT:**  Overruled.

14          (WHEREUPON, the trial proceeded at this point

15          with no further transcription requested.)

16

17

18

19

20

21

22

23

24

25

44

1

2                          C E R T I F I C A T E

3           I, April Lassiter-Benson, do hereby certify that the

4      foregoing 43 pages are, to the best of my knowledge, skill

5      and ability, a true and accurate transcript from my

6      stenotype notes in the matter of:

7

8      LARRY JONES

9      vs.

10     COUNTY OF LOS ANGELES

11

12           Dated this 5th day of November, 2024.

13

14     S/*APRIL LASSITER-BENSON*
       Official Court Reporter
15     United States District Court
       Central District of California

16

17

18

19

20

21

22

23

24

25

                          APRIL LASSITER-BENSON, RPR
            UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA